# THE STATE vs. JOHN H. SWIFT.

Hartford Dist., Oct. T., 1888.  PARK, C. J., CARPENTER, PARDEE, LOOMIS
and BEARDSLEY, Js.

On an indictment for murder a policeman who had the prisoner in charge
immediately after the homicide, testified to a confession of his guilt
made at the time.  The counsel for the prisoner on cross-examination
asked him if he was familiar with the effect of liquor upon those who
drank it to excess, and was proceeding to suppose a case, when, on ob-
jection of the state's attorney, the court ruled out the inquiry.  Held,
on appeal by the prisoner after a conviction—

1. That an inquiry by the prisoner's counsel as to his actual condition in
respect to intoxication at the time he made the confession, would have
been proper.

2. But that the questions put were proper only for an expert in such a mat-
ter, and had no relation to the actual condition of the prisoner.

3. That no claim having been made in the court below that the purpose of
the inquiry was to ascertain the actual condition of the prisoner at the
time, it could not now be claimed that the questions were asked for
such a purpose.

The defense offered the testimony of the mother and sister of the prisoner,
that he had from time to time before the homicide said to them that he
was greatly attached to his wife, who was the person killed by him.
Held to be inadmissible.

The sister of the prisoner having testified that his relations with her mother
and herself were pleasant, was asked on cross-examination whether her
mother and she had not gone to the prosecuting attorney of the city, to
request him to write the prisoner a letter telling him not to come home.
She replied that it was so.  The attorney for the State then requested of
the prisoner's counsel the production of the letter and offered to wait for
it to be procured.  Held that, the letter not being produced, and there
being no request for time to get it, its contents might be stated by a
person to whom the prisoner read it.

And held that the matter was admissible as tending to contradict the testi-
mony of the mother and sister as to the prisoner's friendly relations
with the family.

A statement of the wife was offered in evidence as her dying declaration,
with proof that she was in a dying condition, and was received without
objection.  Afterwards the testimony of a Catholic priest was offered
to show that before the declaration he administered to her the last rites
of the church; the evidence being offered to show that she was con-
scious of being near death.  Held—

1. That it was strong evidence to prove her knowledge that she was in a
dying condition. .

2. That it made no difference that sufficient evidence of this had already

been introduced and that the declaration had been admitted without objection, the State having the right to accumulate evidence on the point.

3. That it made no difference that the evidence was received after the proof of the dying declaration, as the order in which evidence should be received was a matter within the discretion of the court.

To constitute murder in the first degree it is not necessary that the person committing the murder should have been in such a mental condition as to have been "capable of carefully weighing the reasons for and against the act."

It is enough if he had mental capacity sufficient to form a specific intent to commit the homicide, and apprehended the nature and character of the act, and committed it willfully, deliberately and premeditatedly.

[Argued November 21st—decided December 14th, 1888.]

INDICTMENT for murder in the first degree, in the killing of Catherine J. Swift, the prisoner's wife; in the Superior Court in Hartford County. The case was tried to the jury upon the plea of "not guilty," before *Sanford, J.* Verdict "guilty of murder in the first degree," and appeal by the prisoner. The case is sufficiently stated in the opinion.

*S. F. Jones* and *C. J. Cole*, with whom was *D. A. Markham*, for the appellant.

1. To prove deliberation and premeditation the State relied upon the testimony of George F. Bill, of the Hartford police, relating to a confession of the defendant. He testified that the prisoner told him that "he had the pistol in his pocket the day before when he came up town, thinking he would pawn it, but on his way he changed his mind and thought he would shoot his wife. He then said he had no opportunity to do it that day, but this day he did, and shot her." It was of great consequence, as affecting the admissibility of those confessions, or as affecting the weight to be given to them if admitted, that the court and jury should know the circumstances under which they were made and the condition of the prisoner when making them. It is settled law that confessions of persons charged with crime must be wholly voluntary. No cases require more careful scrutiny than those of disclosures made by a party under arrest to the officer who has him in custody. *Com.* v. *Taylor*, 5 Cush., 605; *Com.* v. *Tinkmann*, 10 Gray, 173; *Com.* v. *Cur-*

*tis*, 97 Mass., 574.   Confessions by one so intoxicated as not to understand them are no evidence of guilt.   Whether a party making confessions was so much under the influence of intoxicating liquor as not to understand what he was confessing, is a question for the jury.   *Com.* v. *Howe*, 9 Gray, 110 ; *Grosse* v. *State*, 11 Texas Court of Appeals, 364 ; *State* v. *Feltes*, 51 Iowa, 495 ; *Lester* v. *State*, 32 Ark., 727 ; *People* v. *Robinson*, 19 Cal., 40 ; *Rex* v. *Spilsbury*, 7 Car. & P., 187.   The State objected to the cross-examination of Bill for the purpose of showing that the prisoner was intoxicated at the time the confession was made.   The court sustained the objection, and held in substance that the condition of the prisoner at the time of making the admission could only be shown when he was putting in his case in defense. Such ruling violates every principle of law upon that point, and as we believe must be held erroneous.

2. The second point in order upon the record relates to the ruling of the court in receiving the testimony of Rev. Mr. Carroll against the defendant's objections.   The dying declaration of Kate Swift had been offered in evidence by the State and received without objection by the defense, and the testimony of the Rev. Mr. Carroll was not offered until after the dying declaration had been received, and all other evidence upon the part of the State had been presented. Although the evidence was claimed by the State in support of the dying declaration, it was admissible for that purpose only as preliminary to it and for the purpose of showing that it was made under such circumstances as to be admissible.   The dying declaration having been received without objection it became unnecessary to support it by extrinsic evidence, and therefore, though claimed in support of it, the real object must have been different from the pretended one.   It was used, so far as might be, to prejudice the minds of the jury against the accused.   Under the circumstances the evidence was wholly irrelevant, and had a tendency to prejudice the minds of the jury, and should not have been received.   *McDaniel* v. *State*, 8 Sm. & Marsh., 401.

3. The third error assigned relates to the ruling of the

court in rejecting the evidence of Mrs. Swift as offered by the defense. To sustain its case the State was bound to prove that the homicide was committed with actual malice, with deliberation and with premeditation. To meet the claim of the State the defense claimed that at the time the defendant was intoxicated, and was incapable of deliberation and premeditation within the proper legal meaning of the term, and to show absence of actual malice, and to show the kindly feeling of the accused to his wife, and to show that the act could not have been a deliberate act, perpetrated by the prisoner in a natural condition of mind, the defense offered the testimony of Mrs. Swift as to the relations between the accused and his wife, and as to the expression of kindly feeling by him toward her. This evidence the court rejected. For the purpose claimed we think the evidence was of great importance to the accused, was material to the issue, and should have been received. It is a general principle governing the admissibility of evidence, especially in cases of this character, that all evidence tending to show the relations of the parties, and to show absence of actual malice or premeditation, in however small a degree, should be received. Stephen's Dig. of Law of Evidence, 53, and cases cited; *State* v. *Johnson*, 40 Conn., 143.

4. The fourth error assigned relates to the cross-examination of Miss Swift by the state's attorney, in which an attack was made, or attempted to be made, upon the prisoner's character, by showing that the accused had been previously arrested for a crime other than the crime with which he was charged in the indictment. It is a well-settled principle of law that the State cannot attack the character of an accused person until the defense has offered evidence in support of character. Wharton's Crim. Law, § 638; Stephen's Dig. of Law of Evidence, 111; 3 Greenleaf Ev., § 25; *People* v. *Greenwall*, 108 N. York, 296; *State* v. *O'Neal*, 7 Ired. Law, 251. It is also a principle of law that the evidence both in support of character and against character must be general, and evidence of particular instances of misconduct is not admissible. Wharton's Cr. Law, § 636, and cases there cited.

5. The next error assigned relates to the evidence of Dwight E. Sanford. This witness was offered by the State in rebuttal, and, against the objection of counsel for the accused, was permitted to testify as to the contents of a certain letter. The contents of the letter formed no legitimate part of the State's case, and did not rebut any testimony offered by the defense, and was therefore not admissible. It was secondary in its character, and for that reason was not admissible, except upon reasonable request and opportunity given to produce the original, neither of which was given in this case. Upon the cross-examination of Miss Swift, the State drew from her the substance of the letter. The cross-examination was on a collateral point, not inquired into by the defense. The State was therefore bound by the cross-examination, and could not offer evidence to contradict her upon that point. *People* v. *Greenwall*, 108 N. York, 296, and cases there cited ; *Fletcher* v. *Boston & Maine R. R. Co.*, 1 Allen, 9 ; *Com.* v. *Cain*, 14 Gray, 7 ; Note to *Turnpike Co.* v. *Loomis*, 88 Am. Dec., 322.

6. The next error assigned relates to the charge of the judge. The defense rested upon a single point. This point appears upon the record as follows : " Counsel for the prisoner offered evidence to prove, and claimed to have proved, that the prisoner was intoxicated at the time of the homicide, and that the prisoner had been upon a prolonged debauch of intoxication, whereby his mind had become weakened and delirious, and to such an extent that, at the time of the homicide, he was incapable of exercising the mental power of deliberation." They asked the court to define the term " deliberation " in a certain manner, which definition was in accordance with the meaning of the term as generally used. There was then, at this point, only one question calling for the instruction of the court to the jury ; that is to say, the legal meaning of the term " deliberation." The court upon that point refused to charge as requested, and gave the charge which is found upon the record. The question had assumed a very simple form. But the manner in which the court below attempted to elucidate it seems to

us to have been such as to confuse and mislead the minds of the jury, rather than to direct them upon the simple point in question. Here was no question of insanity. The evidence of intoxication had been received. The only question was as to its effect. But in endeavoring to explain the effect and its relation to the question of deliberation, the court instructed the jury that the principles were the same as those which govern in cases of insanity. In other words, in order to justify the jury in finding a verdict of murder in the second degree instead of the first degree, they must find that the accused was so under the influence of liquor as not to be the subject of punishment at all. The court further added—" Drunkenness does not excuse a party from the consequences of a criminal act; one crime cannot justify another. A man committing a criminal act, though intoxicated at the time, is a legal and proper subject of punishment." In the case of *State* v. *Johnson*, 40 Conn., 136, the court below had made use of that language, but the court above held (40 Conn., 144,) that the language was misleading and ordered a new trial. The court then went on to charge the jury with reference to manslaughter :—" If the prisoner was in fact intoxicated at the time of the homicide, that does not, as matter of law, reduce the offense to manslaughter, much less does it justify the prisoner ; nor does it in point of law reduce it to murder in the second degree." There was no occasion for this instruction. The tendency of it, even with the explanation that followed, was to leave upon the minds of the jury the belief that the law is " that intoxication of the prisoner could not be such as to reduce the crime to murder in the second degree."

7. The law is settled that the fact of intoxication may be shown by the defense upon the charge of murder in the first degree in order to show that it was not deliberate and premeditated, thus reducing the crime from the first to the second degree. It is conceded that intoxication does not necessarily and as matter of law have that effect. We claim, however, that as matter of common knowledge a drunken man, until the point of actual insensibility is

reached, has some will, some reason, and some activity of mind. Therefore if the charge of the court below be correct in law, as matter of fact drunkenness, in order to reduce the crime of murder from the first to the second degree, must proceed to the point of insensibility, when the drunken man would be incapable of performing any act or committing any crime. The effect of liquor upon the mind and body is various, according to circumstances and temperament. Science teaches that the alcohol of the liquor passes almost immediately, without digestion, to the blood and brain. Under its influence, whether greater or less, neither the mind nor the body acts naturally. The extent of its effect and influence is to be judged and determined by the conduct of the person under its influence. A drunken man has a will, but it is a drunken will. He has reason, but it is a drunken reason. He has activity of mind, but it is a drunken activity of mind. And he has up to the point of insensibility some powers of deliberation, but they are drunken powers of deliberation. And all his acts, and all his reasoning, and all his power of deliberation, are drunken and abnormal. To hold as matter of law that such a man, because he had some activity of mind, some power of reason, some power of deliberation, though none of them running in the natural channels, could be capable of such deliberation and such premeditation as the law requires to convict of murder in the first degree, would have the effect to overrule and set aside the principles established in the case of *State* v. *Johnson*, 40 Conn., 136.

*A. F. Eggleston*, State's Attorney, for the State.

PARK, C. J. The indictment in this case charges the defendant with the commission of the crime of murder in the first degree, perpetrated upon the person of his wife.

On the trial in the court below, the attorney for the State called one George F. Bill, the captain of the police force of the city of Hartford, as a witness in support of the prosecution, who testified " that he had been connected with the

police force nearly twenty-one years; that on the day of the homicide the defendant was brought to the station by officer Steele, who delivered to him a revolver; that he asked the defendant why he shot his wife, to which he replied—' Because she refused to live with me;' that he asked if that was his pistol, and he answered that it was; that the defendant then went on to state that he had the pistol in his pocket the day before when he came up town, thinking he would pawn it, but on his way up he changed his mind, and thought he would shoot his wife; that he had no opportunity to do it that day, but to-day he had, and shot her."

During the cross-examination of this witness he was asked the following questions: " Have you had a great deal of experience with drunken men?" To which he answered— " Some." " You have had experience enough to be able to tell the effect of liquor upon a man,—the amount of liquor an ordinary man could drink without being affected by it, haven't you?" To which he answered—" That depends upon the man a good deal." " You have been twenty-one or twenty-two years a police officer; I want to suppose, Captain Bill, that here is a young man,"—

At this point of the inquiry the attorney for the State objected to any questions being put to the witness as an expert in that part of the case, for the reason that it was not cross-examination upon anything the witness had testified to in chief, and because such evidence was part of the defense. The attorney in making his objection said that the State would have no objection to any number of such questions when the defendant should come to his part of the case.

The court sustained the objection; and this raises the first question made in the case.

The claim is now made that the object of the inquiries was to show by the witness that the defendant, when he made the admissions stated, was in a state of intoxication, so much so that the admissions were entitled to no consideration or to but little.

The defendant made no such claim when the objection

was taken in the court below, as he was bound to do if he made it for any such purpose. Indeed he made no claim whatever that the questions were legitimate cross-examination, or legitimate inquiries in that stage of the case, but seemed to concede by his silence that the objection was well taken.

It is impossible to see how any answer to the interrogatories would tend to prove in what state of mind the admissions were made. They tended merely to show the knowledge of the witness, derived from long experience in witnessing the effects of spirituous liquors upon men, and in seeing how much an ordinary man could drink of such liquors without being affected thereby. Surely such knowledge was of no importance in the case, unless to show that the witness was an expert on the subject of intoxication, as evidently such was the purpose intended.

It requires no special, peculiar knowledge to determine whether a man is intoxicated or not. The signs of intoxication are known to all men. They are so marked and peculiar that no one can be deceived in regard to them. Every person of mature years can easily detect them—one as well as another, and one may as well be called an expert on the subject as another.

If the defendant really wished to inquire concerning the condition of the defendant when he made the admissions of guilt, he would have inquired directly on the subject. No objection would have been made to such interrogatories, for they would have been legitimate examination concerning the admissions, and the court would have erred in rejecting them. But no such inquiries were made, no claim was then stated that the defendant wished to make such inquiries, and we think it is too late now to make the claim that they were asked for such a purpose.

The objection was only to inquiries calling forth the opinion of the witness as an expert, and not to questions concerning his knowledge of the condition of the defendant when he made the admissions, as the defendant now attempts to claim. The difference between the two is mani-

fest. In one case a witness testifies to facts that he knows to exist, in the other he gives merely his opinion without any direct knowledge of the facts.

We think it clear from the record that the question the defendant now makes was never raised in the court below and was never passed upon by the court. There is no error in this ruling of the court.

The defendant further complains of the ruling of the court upon a question relating to Mrs. Swift's dying declaration. This part of the case is stated in the finding as follows :—" The dying declaration of Mrs. Swift was offered in evidence, and was received without objection. The State then offered Mrs. Tuttle as a witness, who testified that she was in charge of the training school at the hospital ; that she was present at the taking of the dying declaration, and that Mrs. Swift was visited by a priest before the declaration was made. The State then offered the evidence of one Dr. Green, who testified that he was house-surgeon at the hospital ; that he was present when Mrs. Swift made her dying statement ; and that her mind was perfectly clear when she made it. The State then offered the evidence of one Carroll, who testified that he was a priest of the Roman Catholic Church, and was connected with St. Peter's Parish. The attorney for the State then asked the witness the following question :—' Were you called to administer the last rites of the Church to Kate Swift at the hospital ?' The defendant objected to the question, and objected to all the witness might say upon the subject. The State claimed the evidence in support of the dying declaration of Mrs. Swift, for the purpose of showing her mental capacity and consciousness of approaching death."

The court admitted the evidence, and the witness testified that he administered to her the last rites of the church, which were confession, absolution and extreme unction.

The defendant claims that the evidence was not admissible because it was offered after the dying declaration had been received without objection ; and that it was then irrele-

vant, and had a tendency to prejudice the minds of the jury against the defendant.

The claim of the defendant seems to concede that if the evidence had been offered before the dying declaration had been received, it would have been admissible, for then it was important to prove that when the declaration was made the declarant believed that her death was impending; but after evidence had been given on that subject sufficient to make the declaration admissible, and the declaration had been received without objection, all further evidence tending to prove such fact became unimportant and irrelevant.

In making this claim the defendant seems to have forgotten that the order in which evidence is received is wholly discretionary with the court, and is not the subject of review by this court.

In a case of this character it was highly important for the State to prove beyond all reasonable doubt that when the dying declaration was made Mrs. Swift believed, fully and entirely, that her death was impending. The evidence in question was the strongest that could be offered on the subject. It gave character and weight to her declaration with the jury, and at the same time it established beyond all question the admissibility of her declaration in evidence. There was no error in this ruling of the court.

The defendant offered the testimony of his mother to prove, by stating the declarations the defendant had made to her from time to time, that he was greatly attached to his wife. The State objected to such evidence, and the court rejected it; and this action of the court is made the subject of complaint.

The declarations of a party in his own favor are never evidence of the truth of what is declared, unless made so by statute. This claim is without merit.

The defendant offered the testimony of his sister for the purpose of showing that he was drunk and delirious on the day of the homicide, and that he had been drunk and delirious for several days before. She also testified in chief as to the history of the defendant for several years; as to

the places where he had worked since his marriage; as to his conduct while at work at different places; and as to his relations to his mother and herself, and their careful and tender treatment of him.

Upon the cross-examination the State asked the witness in regard to her personal relations to her brother, and among other questions asked the following, to which the answers appended were given. *Question.* " Was he asked not to come home?" *Answer.* " Why no; he never was asked not to come home. We were very glad to have him come home if he behaved himself." *Qu.* " Was he asked not to come home?" *Ans.* " No, he was not asked not to come home; but when he was working my mother tried to force him to board away from home or else pay for his board at home, and he did not care to do that." *Qu.* " So your mother did want him to board away from home when he was drunk?" *Ans.* " If he would not pay for his board at home she suggested that to him." *Qu.* " If he did not pay for his board at home he should board away from home?" *Ans.* " She would be glad to have him at home if he would behave himself." *Qu.* " Do you remember when he was arrested for an assault on his brother?" *Ans.* " I do remember that." *Qu.* " How long ago was that?" *Ans.* " I do not remember." *Qu.* " Was it a year ago?" *Ans.* " I think it was more than that."

The defendant objected to an examination on this subject. The State claimed it merely to refresh the memory of the witness, and fix a date. The court allowed the examination. For the purpose stated the ruling of the court was clearly correct.

The cross-examination then proceeded. *Qu.* " Was it about a year and a half ago, should you think?" *Ans.* " Well, I should think it was about a year or a year and a half ago, but, as I say, I am not positive about the time." *Qu.* " Well now, about that time was he told that he must not come to the house?" *Ans.* " He may have been; I don't know." *Qu.* " What?" *Ans.* " He may have been told so; I cannot say." *Qu.* " Did you not—either yourself, or you and

your mother—go to the prosecuting attorney to have him write a letter telling him not to come home?" *Ans.* "Yes, I remember that; but whether it was at that time or not I do not recollect."

The defendant objected to this line of examination. The court overruled the objection. The examination was made, and allowed by the court, on the ground that the evidence obtained thereby tended to disparage the testimony of the witness given in chief in regard to her relations with the defendant. We think it is clear that no error was committed by this ruling.

The State offered in rebuttal the evidence of one Sanford, who testified that the defendant worked for him from the middle of September, 1886, to about the Christmas following; that during the latter part of the time he showed him a letter that he had received from some attorney in Hartford; that as he presented the letter he said, "Here is a pretty warm reception," and then asked the witness to read it, which the witness did. The sister of the defendant had previously stated, "that during the latter part of the year 1886 she and her mother went to the prosecuting attorney of the city of Hartford and requested him to write the defendant a letter telling him not to come home; that she and her mother did not want to drive him from home, but wanted to make a responsible man of him." The defendant objected to the witness stating the contents of the letter. The State requested the defendant to produce the letter, and stated that if it could be produced the State would wait for its production; but the defendant did not produce it, and did not claim that it could be produced; neither did he ask time for its production. The court allowed the contents of the letter to be given in evidence.

The witness then stated that the letter "instructed the defendant to leave home, and take his effects with him, and to leave forever; and stated that if he made any trouble in doing so for his mother or sister, he would furnish him a home in Seyms street."

We think the contents of the letter were clearly admissi-

ble under the circumstances. The defendant had ample time and opportunity to produce the letter; but he neglected and refused to do so. The letter tended to disparage the testimony given by the mother and sister in regard to their relations to the defendant. It was written by their agent and upon their direction.

The remaining question in the case is concerning the charge of the court to the jury. The defendant requested the court to charge the jury in accordance with a number of requests which he presented in writing. In each of them was the phrase—" That his mental condition must have been such that he was capable of a careful weighing of reasons in order to a decision." The court charged the jury in the language of the requests with the exception of the phrase quoted, which the court refused to give the jury; and the defendant claims that the court erred in its refusal.

This question has been decided many times in the Superior Court during the past fifteen years in accordance with the charge of the court, and it has been fully and elaborately decided in the same way by this court in *State* v. *Johnson*, 40 Conn., 136, and *State* v. *Smith*, 49 Conn., 376, and should be regarded as settled.

The question is, what degree of mental capacity a person must have in order to be able to commit murder in the first degree? The statute declares that all murder, like the one we are considering, perpetrated willfully, deliberately and premeditatedly, shall be murder in the first degree. If the defendant had mental capacity enough to take the life of his wife with all these elements in the homicide, as the court in its charge repeatedly told the jury he must have in order to commit murder in the first degree, was any greater mental capacity required?

The defendant claims that his mental capacity must have been such, that he was " capable of a careful weighing of reasons in order to a decision." A decision of what? Whether he will commit the atrocious crime of murder upon the person of his wife while on her way home from her daily toil. What amount of mental capacity will it

require, what degree of deliberation will be necessary, in order to carefully weigh the reasons for and against it, in coming to a decision of that question? There are no reasons but those of a negative character, warning him to pause, and those are few and on the surface, though cogent in character.

But it is unnecessary to pursue this subject further, for the cases cited have expressly decided that such capacity as the defendant claims to be necessary is not required. In *State* v. *Johnson* the court say : " To be the subject of punishment an individual must be a moral agent; must have mind and capacity, must have reason and understanding, enough to enable him to judge of the nature, character and consequences of the act charged against him, that the act is wrong and criminal, and that the commission of it will properly and justly expose him to penalties." In *State* v. *Smith*, the court held that " if the accused, before the homicide and down to its commission, had control of his mental faculties enough, and had mental capacity enough, to form a specific intent to kill the deceased, and did so kill him willfully, deliberately and premeditatedly, and while apprehending the nature and character of the act, he had mind enough and capacity enough to commit murder in the first degree. If he had not such capacity, then he could not commit murder in the first degree.

There is no error in the judgment complained of.

In this opinion the other judges concurred.