The State *v.* Chapman.

---

THE STATE OF CONNECTICUT *vs.* GERALD CHAPMAN.

First Judicial District, Hartford, October Term, 1925.

WHEELER, C. J., CURTIS, KEELER, MALTBIE and HAINES, Js.

Upon an appeal from the denial of a motion to set aside a verdict of guilty of murder in the first degree, the function of this court is to determine whether the jury might reasonably have found that the evidence established beyond a reasonable doubt and by the

The State *v.* Chapman.

testimony of at least two witnesses or its equivalent, as required by § 6633 of the General Statutes, the guilt of the accused as charged.

The requirements of § 6633 are fully satisfied if one or more witnesses testify to facts which are relevant and sufficient to prove some of the essential elements and another witness or witnesses testify to facts relevant and sufficient to prove the remaining essentials.

The evidence in the present case reviewed and *held* to lead to the conclusion that the verdict of guilty returned by the jury was the only result which reasoning minds could reasonably have reached.

The burden rests upon one who moves for a change of venue, to establish that a fair and impartial trial cannot be had in the county where the indictment is returned.

Upon appeal from the denial of a motion for a change of venue, the finding should set forth the grounds of the motion and the facts upon which the ruling of the trial court was predicated.

Unless it is clear that the trial court, in denying such a motion, abused the discretion which it always exercises in passing upon matters of that nature, its ruling is final,—a principle controlling in the present case, where it appeared that the trial court's conclusion was based upon conflicting evidence as to the existence of local prejudice, and that the accused had, in fact, received a fair and impartial trial.

Under § 5688 of the General Statutes, a jury panel must be drawn "in a manner to ensure a reasonable distribution among the several towns of jurors as drawn;" but a distribution which, on its face, seems to violate the terms of the statute, may be shown, in fact, to be reasonable under the circumstances, as, for example, where the trial court excludes a town in which the crime was committed or in which, for any other reason, local prejudice may exist, or where, in view of the probable necessity of drawing additional jurors or summoning talesmen, the trial court, in the exercise of a sound discretion, reserves the larger towns or cities for this purpose as affording a more readily accessible source than the more remote and scattered communities.

A conviction will not be reversed because of mere irregularities in the drawing of jurors, unless it appears that they actually operated to the prejudice of the accused.

Matters concerned wholly with the conduct of a criminal trial, such as the segregation of witnesses, the granting of separate trials, and the order of receiving testimony, rest within the sound discretion of the trial court.

When a ruling concerning the conduct of a trial, or the admission of evidence, is made a ground of appeal, the facts relevant to a proper presentation of the question should always be incorporated

The State *v.* Chapman.

in the finding; this cannot be accomplished by merely attaching to the finding excerpts from the testimony.

The claim of the accused that the rising of three men during the introduction of two bottles of nitroglycerine, constituted a theatrical display designed by the State's Attorney to influence the minds of the jurors, was not supported by the record, since there was no indication that the State was responsible for the incident and, moreover, had the incident borne the construction placed upon it by the accused, it could not of itself be held to constitute reversible error.

The argument of the State's Attorney in the present case examined and *held* not only to fall far short of the flagrant impropriety which, alone, will justify a reversal by this court, but to be well within the limits of fair advocacy in view of the evidence and the preceding remarks by counsel for the accused.

The provisions of § 5785 of the General Statutes, that after a cause has been committed to the jury "no pleas, arguments or evidence shall be received before the verdict is returned into court and recorded," relate solely to civil trials; and, therefore, in a criminal case, the reception of such matters after the deliberations of the jury have commenced, is within the sound discretion of the trial court.

In a prosecution for a capital offense, the trial court may, provided it exercises a reasonable discretion to protect the accused against improvidence or mistake, permit him, or his counsel, to admit some facts which, though necessary for the State to establish, are consistent with his innocence and the grounds of his defense.

During the deliberations of the jury in the present case, they requested that a timetable be placed in evidence as an exhibit, which was permitted by the trial court, after the counsel for the defense, having consulted with the accused, and the State's Attorney had expressed their consent. *Held* that there was no error in the ruling of the trial court.

The fact that evidence, otherwise relevant and material, tends to prove the commission of other crimes by the accused, does not render it inadmissible.

Evidence of other crimes is objectionable when its only tendency is to affect the character of the accused; but if such other crimes are so connected with the principal crime by circumstance, motive, design or innate peculiarity that the commission of the former tends to prove the commission of the latter, the evidence is admissible.

In the present case, S, a witness for the State, testified that he and the accused left Springfield in the latter's automobile on Saturday afternoon, spent the night in Meriden, and proceeded to New

The State *v.* Chapman.

Britain early the following morning, where the accused broke
and entered a department store, blew open one safe and was
engaged in preparations to blow another when S, becoming
frightened, left him. It appeared from other evidence that
shortly thereafter a police officer, for whose murder the accused
was on trial, was shot to death in the department store. *Held*
that to corroborate the testimony of S and to prove the presence
of the accused in the department store on the morning of the
homicide, it was permissible for the State to show the origin and
history of the relations between them, to trace the accused's
acquisition and possession of the automobile in question, and to
identify as belonging to the accused numerous articles found in
the automobile and on the premises of S in Springfield, even
though the evidence offered for these purposes also tended to
prove that the accused was an automobile thief, a professional
safe-blower, and had engaged in the commission of various other
crimes.

The failure of the State to connect the accused with certain library
books, marked for identification, which were found among his
effects in Springfield, was not harmful to the accused where the
State's Attorney later withdrew the offer and the trial court
cautioned the jury to consider only such exhibits as were ad-
mitted in evidence.

Where an accused is a witness in his own defense, it is always open
to the State to attack his credibility by cross-examination tend-
ing to show the commission of other crimes.

Although, in a prosecution for murder, it is within the province of
the jury to find the accused guilty of homicide in a less degree
and, although the trial judge must clearly explain to the jury
their statutory power in this regard, it is always his privilege,
and frequently his duty, to express to the jury, within the limits
of reasonable discretion, his own opinion; and, as in all instances
where the duty to aid the jury to reach a sensible, intelligent and
fair determination requires judicial comment, the charge will
inevitably uncover to some extent the weakness of a weak case,
the difficulties of a difficult case, or the strength of a strong case.

Argued October 8th—decided November 5th, 1925.

INDICTMENT charging the accused with the crime
of murder in the first degree, brought to the Superior
Court in Hartford County and tried to the jury before
*Jennings, J.;* verdict and judgment of guilty, and ap-
peal by the accused. *No error.*

*Nathan O. Freedman* and *Charles W. Murphy*, with whom, on the brief, were *Frederick J. Groehl* of New York City and *Frank A. Murphy*, for the appellant (the accused).

*Hugh M. Alcorn*, State's Attorney, with whom was *Reinhart L. Gideon*, Assistant State's Attorney, for the appellee (the State).

WHEELER, C. J.　The appeal is from the denial of the motion of the accused to set aside the verdict and for interlocutory rulings and exceptions to the charge. Thirteen points assigned as error in the appeal are pursued in the arguments and brief in behalf of the accused; since our examination of the record has not disclosed other points in the appeal which in justice to the legal rights of the accused should be considered and disposed of, we confine the opinion to the consideration of these thirteen grounds of error which we find can be resolved to ten.

1. The denial of the motion to set aside the verdict is to be tested by determining whether the jury might reasonably have found that the evidence established beyond a reasonable doubt the guilt of the accused as charged with the commission of the crime of murder in the first degree and by evidence equivalent to that of two witnesses. The determination of this ground of error has required us to make a complete study of the entire evidence, of which we present a summary of its most material features. The State offered the evidence of Shean,—an admitted accomplice of the accused in the breaking and entering of Davidson and Leventhal's store in New Britain on the morning of October 12th, 1924,—that he became acquainted with the accused as Waldo W. Miller in June, 1924, while Miller and one Anderson were in Springfield in a Lin-

coln touring car which the accused was operating. At various times during that summer Shean and the accused met at several places in the vicinity of Springfield, and at times they talked over the telephone. Early in September following, Shean received from the accused by mail a letter, which the State laid in evidence, giving him instruction as to the disposition of mail arriving at the Cooley Hotel under the name of Waldo W. Miller. The State offered evidence that on September 5th, 1924, application was made by the accused to the Motor Vehicle Department of Massachusetts for the registration of this Lincoln car and it was registered in the name of Waldo W. Miller, Cooley Hotel, Springfield, and a license to operate it issued to Miller. Before its registration in Massachusetts the motor number and the plate number had been changed and the car was registered under the changed numbers.

During one of his visits to Springfield, the accused informed Shean that he wanted to buy a house in the vicinity of Westfield, Massachusetts. He described in a note written to Shean and left with Shean's brother for him, the kind of place he desired to purchase. Through other witnesses the State offered evidence to prove that, under the name of George L. Sherbourne, the accused and Anderson negotiated for the purchase of a place between eight and thirteen miles from Northampton; that the title was taken in the name of Waldo W. Miller, and two payments made on the price, the last one, $5,000, with a cashier's check obtained in Springfield through a trust company upon the introduction by Shean of the accused to the cashier as George L. Sherbourne. Shean testified that the accused told him that he had located a house about seventy miles from Springfield, and asked Shean if he could ship some household articles to Shean's place of business, which would be later removed to his house,

and Shean consented. Later in the month of September four large traveling bags wrapped in paper and two bundles wrapped in burlap, bearing the mark Eaton, Indiana, were delivered to the Shean Advertising Company at Springfield, of which Shean was president, and placed in the storeroom of this company. These packages remained unbroken until after the homicide. The State offered other testimony than that of Shean that these packages were shipped from Muncie, Indiana, via American Railway Express, and were so tagged. On Thursday, October 9th, three days before the homicide, the accused arrived in Springfield with the Lincoln car, and in the three days preceding the homicide was in and out of the storeroom, checked up the shipment of these packages, and told Shean that everything was all right.

Shean testified the last time he saw Anderson was on September 20th, when he and the accused were in Springfield in this Lincoln car, and the next time Shean saw the accused was on October 9th, following a telephone call in which the accused said that he had come to Springfield alone and that his car was in need of repairs. As a result of this conversation, Shean says the accused came to his place of business on the evening of October 9th and conversed a half hour, when they went to the Cooley Hotel and the accused registered as W. W. Miller, Pittsfield, Massachusetts, and was assigned to room C 31, he having left the Lincoln car in the garage section of the building of the Shean Advertising Company. The Cooley Hotel register was laid in evidence, showing the registry of this name and place on October 9th. The telephone girl at the hotel identified the accused as having registered at the hotel on the night of October 9th, and having telephoned from the hotel on October 10th. The brother of Shean testified to having seen the accused in Shean's

place of business and in Springfield six or seven times during July, August, September and up to October 11th; and a salesman for Shean identified the accused in the Shean Advertising office during the week of October 7th, and on October 11th, the last time. On the morning of October 10th, Shean says the accused and he removed the trunk from the rear of the Lincoln car to the storeroom, and took the car to a garage for repairs, and that the accused stayed in Springfield and vicinity that day, and that they spent the evening in company with a woman at the Red Tea Room. This woman testified as to this visit, corroborating Shean and identifying the accused. The motor mechanic who repaired the Lincoln car identified the Lincoln car, subsequently referred to as found on Church Street, as the one on which he made the repairs, and the accused as the man who authorized him to make these and to whom he delivered the car when repaired at 12:30 p. m. on October 11th, at Shean's place of business. The accused then took the car to be washed.

Up to this point Shean's statement is corroborated at about every point corroboration could be expected. The accused, who took the stand, did not controvert this statement, nor did anyone else in his behalf. From this point on the accused contradicts Shean's statement. Shean testifies that the accused and he lunched together on October 11th, and at about three o'clock in the afternoon, at the invitation of the accused, they left Springfield in the Lincoln car, and on the way to Hartford the accused explained that he had to do other things besides bootlegging to make money and that he occasionally blew a safe. They reached New Britain about five o'clock; the accused stopped the car on Main Street and went, first, to Besse-Leland's department store, and then to Davidson and Leventhal's store, both located on Main Street.

The State *v.* Chapman.

He returned in a few minutes and stated that "everything is all fixed." The accused then drove to Meriden, where he bought a hand drill and placed it in the car, the drill being later laid in evidence. After driving to Waterbury, the accused drove to the Old Colony Inn in Meriden and left the Lincoln car under a shed in the rear of the Inn; he and Shean were then provided with dinner and lodgings in the Inn, the accused being given, at his request, an alarm clock. The proprietor of the Inn and the employee who prepared and served the dinner, identified the accused as having been at the Inn as Shean had testified. Shean says that next morning the accused, fully dressed, awakened him and they left the Inn before six and drove toward New Britain, and on the way the accused told Shean they were going to New Britain to blow a safe in the department store he was last in the day before, that he could not do anything with the Besse store as it was too well protected. At this time the accused had a small dark mustache and wore a light gray fedora hat, a medium colored mixed gray suit, low tan shoes with rubber soles, and black stockings. Shean wore a brown suit, brown fedora hat, brown shirt and tie, high tan shoes and white stockings. On the way to New Britain the accused took from his automobile a forty-five Colt automatic pistol fully loaded and gave it, with an extra clip of cartridges, to Shean, and told him to place it in his trousers and to keep his belt tight. The accused parked his car facing east on Church Street, New Britain, and about five hundred feet from the entrance to Davidson and Leventhal's store on Main Street, which Church Street crossed at right angles, and then, taking the alligator brief case, which the State subsequently laid in evidence, and another package from the automobile, got out of the car and went away.

After being gone a half hour, Shean testified that the accused returned to the car and said he'd had a little trouble, and asked Shean to go back to the store with him, and they walked to Main Street to this store and through an alley on the side of the store to the rear entrance of the store, and, the accused leading the way, they went up the stairs and on to the mezzanine floor where the large and small safes were. The accused went over to the small safe and returned and handed Shean some money, remarking that he was going to put a good load in the large safe and blow it in a few minutes, whereupon Shean said, "This is too dangerous for me and I don't want any part in this," and left by the rear entrance, carrying the alligator brief case, which the accused had asked him to pick up, and the money handed him, while the accused remained at work preparing to blow the large safe. As Shean was walking down Main Street to Church Street, a bystander pointed him out to police officers and two of them followed him up Church Street. Shean says he got to the car, placed the brief case in the rear of the car and the forty-five automatic pistol and money behind the cushion of the front seat, and just as he stepped from the car and was starting up the street he heard the officers call and he went toward them and was arrested. The officers testified they found the alligator brief case in the rear of the car and it contained a quantity of electric wires, bits, fuses, dynamite caps and fuse wires, and behind the front seat was a forty-five automatic pistol, while a number of bills blew out of the car. In the automobile the officers found, in a locked compartment, two bottles, one full and the other partly full of nitroglycerine capable of being used for safe blowing. Shean did not have the key either to the ignition or to this compartment. At about the time Shean was arrested, three policemen,

Atwater, Skelly and Lamphere, came to the rear door of this store; Atwater entered first and then Skelly. Lamphere had not yet entered when the man who had been interrupted in his preparation to blow this safe, officer Atwater testifies, suddenly appeared at the foot of the stairs leading to the mezzanine floor, and called out, "Get down. I'll kill you, I'll kill you," and almost immediately fired three shots, one of the bullets hit Skelly, and in consequence he died three hours later. Officer Atwater testified that the accused was the man who fired the three shots, one of which mortally wounded Skelly, and that the accused then left by the front door. The State offered evidence to prove that the lock of this door had been previously prepared for the purpose of letting one out, by the removal of a screw and the turning of the tumbler. Two men who stood outside and near the front door, Heller and LaFrance, testified that the accused was the man who came out of the door and ordered them to stand back. Heller said he had in his hand a nickel-plated revolver and LaFrance said a gun. Carlson said he saw a man running at about this time past the Connecticut Company car barn, where he stood, which could be reached by passing through an alley running from Main Street; that the man was only a few feet from him and had on a gray hat, and that the accused was that man. White testified that he saw the accused pass between two buildings and near the blacksmith shop and approaching Church Street, this being near the locality where the Lincoln car had been parked, and that he was dressed in a gray coat, gray fedora hat and a pair of russet shoes. Hance testified that from sometime in April to the following August, 1924, the accused had lived part of the time on his farm in the sparsely settled community near Eaton, Indiana, some eleven miles from Muncie, where the accused had a number

of articles of personal property which included the forty-five caliber pistol and alligator brief case which Shean testified the accused gave him on the morning of October 11th, the bar or jimmy and sledge hammer found in the store near the large safe by Atwater, and an electric drill found in the packages in the Shean Advertising Company storeroom, which Shean testified had been placed there at the request of the accused, and two sawed off automatic shotguns and an automatic rifle, found in the trunk in the storeroom which Shean said had been taken from the Lincoln car and carried to the storeroom by the accused and himself.

Many of these articles were laid in evidence by the State, including another brief case containing thirty-eight caliber bullets, being the same caliber bullet which killed Skelly. Other articles found in the room occupied by the accused in the Cooley Hotel were laid in evidence, including the Indiana number plates for the automobile. The State also introduced as a witness officer Edward J. Hickey, a county detective attached to the State's Attorney's office for Hartford County, who testified that he examined the articles in the storeroom, and in the bottom of one of the bags found the tag with an address thereon, H. R. Spickerman, Muncie, Indiana. The State also introduced evidence to prove that the Lincoln car which Shean said the accused had driven to New Britain on the morning of the homicide, and which the police found on Church Street, New Britain, on the morning of October 12th, had been taken from the Stanton Motor Company in Steubenville, Ohio, on Sunday night, April 6th, 1924; that the accused had been in this company's place of business on the preceding night looking at a Lincoln sedan, which, with the Lincoln touring car found in New Britain, stood on the floor. At about seven o'clock the next morning. Allison tes-

tified he saw the car on the side of the road about forty miles from Steubenville, and the accused standing at its rear. Hance testified the accused had the Lincoln car at his place between April and August, 1924; the next time this car is located by any witness was by Shean in Springfield, in the following June, when the accused was driving the car.

The State further offered in evidence a bullet found in a box of thread in Davidson and Leventhal's store, and the bullet extracted from the body of officer Skelly which killed him; experts called by the State testified that these bullets, which were for a thirty-eight caliber pistol, had been fired from the thirty-eight caliber nickel-plated Smith & Wesson pistol which witnesses testified was taken from the accused when arrested in Muncie, Indiana, on January 18th, 1925, and which was laid in evidence.

The claims of the State in part, are that Shean's story of this transaction, after he says he and the accused drove from Springfield at about three o'clock in the afternoon of October 11th, is corroborated as to their stop over night at the Old Colony Inn, as to the accused having, on the morning of October 12th, blown one safe and made preparations to blow another in this store, by the presence of the Lincoln car on Church Street, New Britain, on this morning, with the alligator brief case and the forty-five automatic pistol in the car, and of the sledge hammer found in the store near the safe, all being property of which the accused had the possession and control, by the fact that Shean was seen upon Main Street or Church Street proceeding toward the Lincoln car and not in the store when the bullet which hit Skelly was fired, by the identification of the accused by Atwater at the very moment he shot Skelly, by the identification of the accused by the two men at the front door of the store as he hurriedly left

the scene of his crime, and by the two men in the alleys leading from Main Street to Church Street, one of whom saw the accused running away from the direction of Main Street, and by the fact that the accused had the nickel-plated automatic pistol in his hand as he went out of the front door and had it upon his person when apprehended in Muncie, and by the further fact that the bullet which killed Skelly came from this same nickel-plated pistol whose possession the accused had during all of this period.

The accused took the stand and denied that he broke and entered the Davidson and Leventhal store, blew or attempted to blow the safes, or shot Skelly, or was in New Britain on either October 11th or 12th, or stopped on October 11th, over night, at the Old Colony Inn. He testified that he was not with Shean after twelve-thirty on October 11th, that he left Springfield at about four o'clock on the afternoon of October 11th, and went by train direct to Brooklyn, reaching a stationery store there sometime between eight and nine o'clock, and was with one Chastain until two a. m. October 12th. Chastain corroborated the accused as to his being with him at this time. The accused also offered evidence to prove: that after Shean's arrest he was taken to the hospital where officer Skelly was dying, and upon being inquired of, Skelly recognized and identified Shean as the man who shot and killed him; that Johnson testified that he saw a man enter the Davidson and Leventhal store on the morning of October 11th, and that he, Johnson, was taken to New York and there picked from a number of persons one George Stuyvesant, as the man he saw enter the store. These instances, the defense contend, show the unreliability of the identification of the accused as made by the several witnesses of the State. Further, the defense urge that the method of identification was bad,

no one of the State's witnesses having picked out the accused from a line of men, but made the identification from a picture, or in the court room when he was in charge of officers. As to the articles of personal property which the State claimed to have traced to the possession and control of the accused, he testified they did not belong to him, but to the gang of which he was a member, and that others had access to the storeroom of the Shean Advertising Company. The accused also offered the evidence of experts that the bullet taken from the body of Skelly was not fired from the nickel-plated thirty-eight caliber pistol taken from the accused in Muncie and laid in evidence by the State.

The defense asks to have the verdict set aside because the State has failed to prove the charge made against the accused by "the testimony of at least two witnesses, or that which is equivalent thereto," as required by General Statutes, § 6633. If the jury believed the testimony offered by the State, they might reasonably have found that one witness, Atwater, saw the accused fire the fatal shot, and that the testimony of Shean, corroborated as it was at most points, until he detailed the occurrences in New Britain, supplemented by the identification of the accused, at the Old Colony Inn, at the front door of Davidson and Leventhal's store, in the alleyway at the Connecticut Company car barn, at the blacksmith shop farther on, and by the accused's possession and control of the sledge and drill found near the large safe, of the Lincoln car found on Church Street, and of all the other articles traced from Hance's place to Shean's and to the Lincoln car, was the equivalent of another witness. Indeed, if they did not credit the identification by Atwater, the jury might reasonably have found the remaining testimony offered by the State equivalent to two witnesses. If, further, the jury did not credit

the State's experts that the fatal shot was fired from the nickel-plated pistol taken from the accused at Muncie, there was still abundant evidence from which the jury could reasonably have found the proof required by this statute fully satisfied. "All that the statute requires, therefore, is that the proof of all the essential elements of the capital crime charged (each of which must be proved beyond a reasonable doubt) shall not depend upon the testimony of one witness. If one or more witnesses testify to facts relevant and sufficient to prove some of the essential facts of the capital crime charged, and another witness or witnesses testify to facts relevant and sufficient to prove the remaining essential facts, the jury may find that the statute has been satisfied." *State* v. *Schutte*, 97 Conn. 462, 468, 117 Atl. 508. If the jury found the facts substantially as claimed by the State, they might reasonably have found that the accused shot Skelly while he was interrupted in the commission of the crime of breaking and entering the Davidson and Leventhal store in the day season with the intent to commit a larceny therein, and of opening or attempting to open a safe in such building by the use of nitroglycerine, and that he broke and entered this store armed and with the intent to kill, if necessary, to accomplish his purpose or effect his escape, and that there were no circumstances present of extenuation, justification or excuse; and if they so found, the legal conclusion must follow, that the homicide was murder committed with malice aforethought and done wilfully, deliberately and premeditatedly, and hence constituted murder in the first degree. The accused's defense, that he was elsewhere at the time of the killing of officer Skelly, at most raises a conflict in the evidence which it was for the jury to resolve. We have no power to set aside a verdict in a case based upon conflicting evidence of

the character found in this record. *State* v. *Cianflone,*
98 Conn. 454, 120 Atl. 347; *State* v. *Alderman,* 83
Conn. 597, 78 Atl. 331.

The State has attacked the alibi defense at many
points. If true, it is a perfectly good defense, some-
times the only defense an innocent man can make, and
not infrequently the resort of the guilty as probably
the easiest and most complete defense possible. It
was for the jury to stand it up against the evidence
offered by the State and then test its truth. That they
have done. We do not purpose rehearsing the State's
grounds of attack of this defense, save in two particu-
lars. It contends that the evidence disclosed that
officer Skelly's identification of Shean was uncertain,
and if he did make a mistake it was due to the physical
and mental condition of this dying man. The State
offered evidence to show that Stuyvesant, whom John-
son identified in New York, was working in Troy at
the time of this homicide.

The various grounds of appeal have required us to
compare and weigh the evidence with the utmost care;
the result of our consideration and reflection has led
us to the fixed opinion that the verdict reached by the
jury was the only verdict which reasoning minds could
reasonably have reached upon this evidence. Seldom
is a charge of this character so completely and con-
clusively proven.

Preceding the trial on the merits the accused moved
for a change of venue and filed his challenge to the
array.

2. The accused moved for a change of venue under
General Statutes, § 6630, which provides: "The judge
holding any term of the Superior Court may upon mo-
tion order any criminal case pending in such court
to be transferred to the Superior Court in any other
county," etc. This statute is declaratory of our com-

mon law. It does not attempt to state the grounds
upon which the court may make the order; unless
controlled by statute, the right of the court to exercise
its common-law power in determining such a motion
remains. The power is one to be exercised with caution
and rests in the court's sound discretion, which is final,
unless it appears clearly that it has exercised its dis-
cretion unreasonably, or, as it is often expressed,
abused its discretion. *State* v. *Cianflone,* 98 Conn. 454,
461, 120 Atl. 347; *State* v. *Luria,* 100 Conn. 207, 209,
123 Atl. 378; *Crocker* v. *Justices of the Superior Court,*
208 Mass. 162, 94 N. E. 369. It is within the reason-
able discretion of the trial court to grant a change of
venue when it clearly appears that a fair and impartial
trial cannot be had in the county where the venue is
laid in the indictment. The burden of showing this
is upon the mover of the change of venue. *Crocker* v.
*Justices of the Superior Court, supra; Downs* v. *State,*
111 Md. 241, 73 Atl. 893; *Burns* v. *Pennsylvania R.
Co.,* 222 Pa. St. 406, 71 Atl. 1054; *People* v. *Pfan-
schmidt,* 262 Ill. 411, 440, 104 N. E. 804. The grounds
of this motion are not stated in the finding, nor are the
facts found upon which the court predicated its denial
of the motion, as is the customary and proper pro-
cedure; instead, the transcript of the entire evidence
submitted in behalf of the accused and of the State is
certified as a part of the record but not of the finding.
The parties have argued the matter upon this record,
and in view of the gravity of the case we have ex-
amined this evidence upon this point. The motion
was supported by considerable evidence tending to
show a liability to local prejudice in Hartford County,
due to the unusual publicity given to the case, par-
ticularly in the newspapers. Evidence in contradiction
of that offered by the accused was offered by the State.
The trial court was obliged, in this conflict of the evi-

The State *v.* Chapman.

dence, to determine whether the accused could have a fair and impartial trial in Hartford County. We can see no indication that the court exercised its discretion unreasonably in reaching its conclusion. The record shows that, in fact, the accused had, under our rules of law, a fair and impartial trial, and that he was accorded all the rights which our law gave him. It is difficult to conceive of a case where a reversal should be granted upon a refusal to order a change of venue after the case has been tried, every right of the accused protected, and a fair and impartial trial accorded him.

3. Error is also claimed in the overruling of the accused's challenge to the array of the jury panel first summoned. The irregularity charged was the failure to draw the jurors from the jury boxes "in a manner to ensure a reasonable distribution among the several towns of jurors as drawn." Prior to 1905, the determination of the distribution of jurors drawn from the several towns was left by implication to the sound discretion of the presiding judge. In Chapter 212 of the Public Acts of 1905, the existing § 660 of the General Statutes of 1902 was amended by limiting the drawing "in a manner to ensure a reasonable distribution among the several towns of jurors as drawn." The statute in this particular remains unchanged. General Statutes, 1918, § 5688. We have construed the provisions of this Act, in the drawing and summoning of the jury panel, to be mandatory. *State* v. *Kelly*, 100 Conn. 727, 730, 125 Atl. 95. In the drawing as made, our attention is called to the fact that in Hartford and Bristol two jurors each are drawn, and in Manchester, Southington and Plainfield no jurors are drawn, while in Burlington and East Granby one half of the total jurors from these towns in their respective boxes are drawn. The allotment of jurors drawn upon its face does not appear to be a reasonable distribution. But

that is subject to explanation. The presiding judge may exclude from the towns from which jurors are drawn the town in which the homicide was committed. *State* v. *Rosa,* 87 Conn. 585, 593, 89 Atl. 163. This ruling was made in order to keep the element of local prejudice from the jury box and to avoid summoning jurors whose interest or knowledge would be liable to make it necessary for the court to excuse them as jurors in the case. For like reasons the area of local prejudice might involve more than one town, and the determination of this must be left to the sound discretion of the presiding judge. It further appears of record that a reason for excluding from the drawing some of the larger towns was the knowledge of the judge of the liability of the panel to become exhausted, and the necessity which would then arise of drawing additional jurors or summoning in talesmen, and for this reason the larger places were reserved so that the jurors might be obtained more readily than in the more remote towns. The presiding judge's anticipation became a fact. The panel was exhausted. A matter of this sort, concerning the conduct of the trial, must be committed to the sound discretion of the court, and we should be unable upon this record to conclude that this discretion had been unreasonably exercised. Moreover, it does not appear that the rights of the accused were unfairly prejudiced by the manner in which the panel was drawn. The rule of law under these circumstances is "that mere irregularities in the drawing of grand and petit jurors, is not a ground for reversing a conviction, unless it appears that they operated to the injury or prejudice of the prisoner." *Cox* v. *The People,* 80 N. Y. 500, 511; *McHugh* v. *State,* 42 Ohio St. 154, 159.

Errors predicated upon the conduct of the trial.

4. The ruling of the trial court refusing to segregate the witnesses was one within the sound discretion of the court; unless the record clearly discloses that this ruling was an unreasonable exercise of the discretion vested in the court, the ruling cannot be held to be erroneous. A ruling of this character is to be determined by the same principle as a motion for a separate trial. Under our practice each rests in the reasonable discretion of the court. In *State* v. *Brauneis,* 84 Conn. 222, 226, 79 Atl. 70, we said: "There is nothing in the record to indicate that he was in any way injured by the court's refusal of his motion for a separate trial. So far as appears, the court's discretion was properly exercised in denying his motion." See also *State* v. *Castelli,* 92 Conn. 58, 65, 101 Atl. 476. In *Weed's Appeal,* 35 Conn. 452, 455, we held that the court had the right to decide which party should go forward, because the decision was one of discretion. Similarly we hold that the order in which evidence is received is discretionary. *State* v. *Swift,* 57 Conn. 496, 506, 18 Atl. 664. Most matters relating to the conduct of the trial are necessarily for the court's discretion. In other jurisdictions it has been uniformly held that a motion for the segregation of witnesses is one within the discretion of the trial court. *People* v. *Rogers,* 163 Cal. 476, 126 Pac. 143; *State* v. *Cristy,* 154 Iowa, 514, 133 N. W. 1074; *Johns* v. *State,* 88 Neb. 145, 129 N. W. 1247; *Harrison* v. *Green,* 157 Mich. 690, 122 N. W. 205. There is nothing in the record before us, and nothing which has been presented in brief or argument, which tends to indicate, in the slightest degree, that the denial of the motion to segregate the witnesses operated to the disadvantage of the accused, or that the trial court exercised its discretion unreasonably.

5. Error is assigned because, during the examination by the State's Attorney of the State's witness Feeney,

a police officer, three men, claimed to be in the employ of the State's Attorney, stood up in the court room, thus creating a prejudicial atmosphere against the accused. Upon its face this statement of conduct on the part of these three men has no tendency to establish the conclusion sought to be drawn. The finding as to this incident follows the draft-finding by merely giving the transcript of a part of the evidence covering this point. The finding should have recited the facts as the judge found them from what occurred in the court room. We have no power to find facts. The practice of presenting rulings made in the admission of evidence, or the conduct of the trial, by merely attaching to the finding a transcript from the testimony, violates our rules and frequently does not furnish us with the facts essential to our proper disposition of the point involved. If we were permitted to find facts, it would appear that Feeney testified that he found in the compartment of the Lincoln car when in the garage back of the police station two bottles of liquid, and that at this point three men arose and stood, and thereupon counsel for the accused objected to the men rising and standing, and the State's Attorney thereupon requested the men to sit down, and counsel for the accused took an exception to the attitude of the men standing up. No ruling of the court was excepted to. No request was made to the court to caution the jury, investigate the incident, or rebuke the State's Attorney, or anyone else, for responsibility for the incident. Nor does it appear that these men were officers, or in the employ of the State's Attorney. So far as the incident is presented in this transcript from the testimony, it furnishes no possible ground of error. If we were at liberty to assume, as counsel for the accused do, that these men were in the employ of the State's Attorney, and, further, to infer that these men

were officers and arose at the very time when the
State's Attorney introduced in evidence two bottles of
nitroglycerine, and that their position in the court
room was in order to better preserve its order and all
present from the danger from this highly explosive
liquid, no error could be successfully predicated upon
the incident.  It would have been a reasonable pre-
caution to have taken.  If, on the other hand, the men
arose, as counsel for the accused urge, as part of a
theatric display designed by the State's Attorney for
the purpose of creating in the minds of the jury an
impression of the desperate character of the accused,
it would undeniably have been reprehensible conduct
on his part; by itself it could not have furnished basis
for reversible error.  The record relieves the State's
Attorney of all responsibility for the incident.

6. Error is assigned because the State's Attorney ap-
pealed to the passion, prejudice, and partiality of the
jury, and because the subjects urged upon the jury
were unfair and prejudicial and were adapted to and
did influence the minds of the jury and prejudice them
against the accused.  The parts of the argument com-
plained of are not numerous and are confined prac-
tically to a severe arraignment of the accused, to the
emphasis placed upon the accused's past record, and
to the explanation offered by the State's Attorney of
the reason why he had brought the accused from the
Atlanta prison where he was serving a sentence.  We
do not deem these criticisms of sufficient importance to
quote them *in extenso*.  It is quite true that the
arraignment of the accused was a very severe one, but
no more so, we think, than was reasonably permissible
in view of the evidence and the record of the ac-
cused, practically admitted or undisputed, and
especially in the light of the argument of counsel for
the accused.  On a number of occasions counsel for the

accused injected foreign matter into his argument. The nature of his argument required a vigorous reply on the part of the State's Attorney. We do not see how he could have done his duty and not made a severe arraignment of the accused. The record of the accused was in evidence, in large part admitted by him on cross-examination when on the witness stand. The State's Attorney's answer to the question of the counsel for the defense as to why he had brought the accused to Hartford County for trial, was that he went to the Attorney-General of the United States and laid before him the facts and he had authorized the accused's transfer from the Atlanta prison to Connecticut. We are of the opinion that the counsel for the accused invited this reply, and that the State's Attorney would have been remiss in his duty not to have made it. The accused was before the court on a habeas corpus, made a part of this record, which recited the fact of the imprisonment of the accused in Atlanta and his transfer by order of the Attorney-General of the United States to the warden of the Connecticut State prison to serve the sentence for which he was imprisoned at Atlanta. In fact, the State's Attorney in his basic facts was within the record; he naturally presented them to the jury with the warmth and color of advocacy. To the twice-expressed suggestion by the counsel for the accused that the State's Attorney had brought the accused back in order to build up his own reputation by securing the conviction of the accused, the State's Attorney made a brief but spirited reply, and concluded: "Oh, I would be unworthy, gentlemen, as a man, a citizen and an officer of the court, if I allowed any motive to prompt me in the discharge of my duty, other than to convict the man who is staring now upon me." There is not in the record the very least excuse for this attack upon the

motives of the State's Attorney. He spoke the truth when he said that he would be unworthy to be an officer of the court if he allowed motives of that character to influence him in the discharge of his official duty. "Looking at the evidence in the case, and the claims and arguments made on behalf of the accused, and the charge to the jury upon the issues in the case, we cannot say that the remarks exceeded the limits of fair argument and comment, or that the accused was thereby deprived of a fair trial, or that the trial court, in refusing to grant a new trial on this ground, exceeded or abused the discretion committed to it in matters of this kind." *State* v. *Laudano,* 74 Conn. 638, 645, 51 Atl. 860. It is not to be forgotten that this court will only grant a new trial for the abuse of the State's Attorney's privilege in argument when it is flagrant. The arguments of the State's Attorney in this case did not fall in that class, and in view of the character of the case, the nature of the evidence, and the argument of the counsel for the accused, they cannot be regarded as improper, much less flagrantly so. Nor is there any basis for holding that in consequence of the State's Attorney's arguments the accused was deprived of a fair trial. We have been impressed on reading this entire record with its freedom from serious controversy on the part of counsel and with the absence of irrelevant and immaterial evidence. In this respect the printed record is exceptional.

7. Error is assigned in the court permitting a time-table to be marked in evidence, upon request of the jury for it after the case had been committed to them for consideration. The defense contend that this ruling fell within the express prohibition of General Statutes, § 5785: "Sec. 5785. QUESTIONS OF LAW AND OF FACT HOW DECIDED. The court shall decide all issues of law and all questions of law arising in the trial of any issue

The State *v*. Chapman.

of fact; and in committing the cause to the jury shall direct them to find accordingly, and shall submit all questions of fact to the jury, with such observations on the evidence, for their information, as it may think proper, without any direction how they shall find the facts. After the cause is committed to the jury, no pleas, arguments or evidence shall be received before the verdict is returned into court and recorded." If the prohibition contained in the last three lines of the section were applicable to a criminal cause, it would not follow that the error in the admission of the timetable was reversible error. The timetable was requested by the jury; thereupon counsel for the State, and for the defense after consultation with the accused, agreed that it might be laid in evidence and marked as an exhibit and it was so marked.

"It is true that in the trial of capital offenses the court will and should exercise care and discretion in respect to admissions made by the accused or by his counsel in open court, and that every conviction should be supported by some evidence produced in court, and so even a plea of guilty will not ordinarily be accepted. But it is not true that an accused cannot, either by himself or his counsel, in his own interest, admit some facts which, though necessary for the State to establish, may be consistent with his innocence and the defense he maintains. Subject to the reasonable discretion of the court in the protection of the accused against improvidence or mistake, admissions during the trial by the accused or his counsel as to the genuineness of a document; admissions as to the testimony a witness not produced would give if present, or the fact his testimony would establish, voluntarily made for the purpose of preventing a postponement of the trial; and admissions in the interest of the accused limiting the issue to the material facts upon which

alone his successful defense depends, have long been permitted under our practice, and we think their lawfulness and propriety rest upon sound reason." *State* v. *Marx,* 78 Conn. 18, 26, 60 Atl. 690. The agreement to admit in evidence the timetable comes within the class of permissible admissions to which reference has been made in *State* v. *Marx, supra.* The agreement of counsel obviated the necessity of proof of its authenticity. Aside from this, a study of the statute indicates upon its face that it relates to civil actions. It provides for the direction of a verdict, a power exercised in civil actions and prohibited in criminal actions. From the earliest beginnings of this statute it is placed under civil actions; thus, in the Revision of 1784, on page 3, it is found in an Act entitled, "Act for the directing and regulating of Civil Actions." In the absence of a statute forbidding the practice, and that is the situation in criminal causes in this State, the trial court may, in the exercise of its discretion, recall a jury to whom a case has been committed and permit additional evidence to be introduced, so long as the rights of the parties are fairly protected. If the practice pursued infringed upon no rule of law and invaded no right of a party, but "merely affected the mode and manner of arriving at a determination," the ruling of the court was within its discretion. We cannot review its exercise unless it be unreasonable, that is, so as to operate unfairly to the disadvantage of one of the parties. *Commonwealth* v. *Ricketson,* 46 Mass. (5 Metc.) 412, 429; *People* v. *Ferrone,* 204 N. Y. 551, 553, 98 N. E. 8; *Royston* v. *Illinois Central R. Co.,* 67 Miss. 376, 384, 7 So. 320; *Parish* v. *Fite,* 6 N. C. (2 Murphey's Law & Equity) 258; *Gandalfo* v. *State,* 11 Ohio St. 114; *Tomer* v. *Densmore,* 8 Neb. 384; *Lueders* v. *Tenino,* 49 Wash. 521, 522, 95 Pac. 1089; 38 Cyc. 1368, notes 22 and 23. The timetable disclosed

that there was a train leaving Springfield at about the time the accused said and reaching New York about eight p. m., thus tending to confirm the accuracy of his statement that he reached Brooklyn sometime between eight and nine. The timetable tended to corroborate the accused's statement. It did not, so far as we can see, disadvantage him. The timetable was admissible because its admission was within the reasonable discretion of the court, and, further, because the counsel for the accused had the right to consent to its admission.

8. Three grounds of error as assigned are in fact one, that the court allowed the State to introduce irrelavant evidence of other crimes which had no relation to the crime charged and were not offered to impeach the credibility of witnesses. The State offered the evidence of Shean, an accomplice, who testified that the accused and he left the Old Colony Inn on the morning of October 12th, and drove in the Lincoln car to New Britain; he also testified to facts which, if believed, would lead irresistibly to the inference that the accused broke and entered Davidson and Leventhal's store from the rear and blew open one safe and engaged in the preparation to blow another. A Lincoln car is found five hundred feet from the place of this homicide, from which the police officers say Shean had just stepped when he was apprehended, and in it are found a forty-five caliber pistol and a number of bills which Shean says the accused gave him, and in a locked compartment of the car, when broken open, are found two bottles of nitroglycerine. In order to corroborate the story of Shean, it was relevant and material to show his entire association with the accused from his first acquaintance with him in June, 1924; to show the possession and control by the accused of the Lincoln car during this association and prior to it, and to show

that the possession or ownership of the articles found in the car were in the accused. For a like reason it was permissible to show that all of the articles found in the Shean Advertising Company's storeroom were in the possession or ownership of the accused during the time they were in this storeroom and prior thereto; to show that the various packages came from Muncie; to identify their contents by Hance, and to show the use of the articles during the time he said they were on his place and the accused staying with him from April, 1924, on. For a like reason it was relevant and material to trace the Lincoln car and the connection of the accused with it, in order to show his possession and control of it. All of his conduct, so far as it affected his relations and association with Shean and tended to corroborate Shean's story, and his possession of the articles found in the storeroom in these packages, in the trunk which came from the rear of the Lincoln car, in his hotel room, and on Hance's place, were plainly admissible because they corroborated Shean's story and were relevant and material evidence to establish the fact that the accused was in New Britain and in this store on the morning of the homicide and was engaged in blowing these safes. The evidence tending to show that the accused stole the Lincoln car, that he was a professional safe blower and connected with other crimes, was not offered and was not admitted for the mere purpose of proving the accused's commission of crimes other than that with which he was charged. The facts were admitted, and properly so, because they were relevant and material in proving the accused guilty of the crime charged. That they also tended to prove the commission of other crimes by the accused was no reason for the exclusion of relevant and material evidence. We said of this kind of evidence in *State* v. *Gilligan,* 92

Conn. 526, 530, 103 Atl. 649: "Such evidence, when offered in chief, violates the rule of policy which forbids the State initially to attack the character of the accused, and also the rule of policy that bad character may not be proved by particular acts. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, or the existence of any essential element of the principal crime, is admissible." See also *State* v. *Ferrone,* 97 Conn. 258, 268, 116 Atl. 336. All of the evidence now complained of was offered and properly admitted under this rule, and much, if not the most, of it came in without objection or exception.

In connection with this point the defense claims that the State's Attorney failed in his purpose to connect certain evidence which was admitted subject to his promise to make such connection. This matter relates to certain books which were marked for identification and later withdrawn by the State. These books were three library books, one each taken from the public libraries of Cincinnati, Dayton and Lima, so their librarians testified, and these the State offered evidence to prove were found among the effects of the accused in the Shean Advertising Company storeroom. If the State had been able to show that these books were taken out of these libraries by the accused, the evidence of these librarians would have been admissible for the same reason that the Lincoln car, for example, was traced to the possession of the accused. Since this was not done, none of the evidence of these librarians was admissible. All of these exhibits, having been found among the articles in the Shean Advertising Company storeroom, would have been admissible in evidence as part of the property placed in the store-

room by the accused.   The withdrawal of the offer of the exhibits for identification was a practical withdrawal of the entire evidence of these librarians.   The court in its charge cautioned the jury against the consideration of any exhibits not received in evidence and not found by them among the exhibits sent to the jury room for their consideration.   Counsel for the accused claim that this was so harmful that the withdrawal could not remove the prejudice.   The titles of these books are "Recovery and Remanufacture of Waste Paper," "Paper Making" and "Printing Inks." By themselves the mere titles of the books could not be harmful.   The only connection in the evidence which it might be claimed did cause harm was a statement of Shean's, in detailing his association with the accused, that "We talked about counterfeiting." This was objected to and the court said it thought it would be well to leave out all such matters.   The jury were then excused, and after arguments by counsel and the State's Attorney the court excluded all reference to counterfeiting, and directed the State's Attorney to keep out all reference to this "counterfeiting outfit."   Under these circumstances, we are unable to understand how it can be fairly claimed that the jury had before them in their deliberations the fact that the accused was a counterfeiter or preparing to be one, and allowed this fact to influence them in their verdict.

9. The claim that irrelevant testimony was admitted certainly is not applicable to any of the testimony excepted to by counsel for the accused; and we know of no material evidence which was not excepted to which was admitted in evidence in behalf of the State, or excluded from the evidence on the objection of the State's Attorney, improperly.   The rulings claimed by the defense under this latter category are too numerous

and too clearly right to warrant us in considering them. That the cross-examination of the accused tended to show the commission of other crimes, did not render it objectionable. He was a witness, and his credibility was subject to attack as in the case of any other witness. It is useless for the first time to make the claim in this court; all of this evidence came in without objection. If there had been a legitimate objection to it, the record would have disclosed some attempt to register the objections and exceptions.

10. Complaint is made that the court erred in limiting the jury in considering the degrees of murder. After defining manslaughter and murder and explaining the element of malice which differentiates murder from manslaughter, the instruction complained of occurs: "Under the circumstances of this case that seems to me to be a sufficient definition of manslaughter and of justifiable or excusable ·homicide. While the facts are in your charge, I can conceive of no theory under which you could find either to have existed in this case." And again, at the conclusion of its charge, the court said: "I have already intimated to you that in my view of the evidence only two verdicts are possible, not guilty or guilty of murder in the first degree. This view, however, is not binding on you, since the statutes provide both that 'the jury before which any person indicted for murder shall be tried may find him guilty of homicide in a less degree than that charged,' and 'the court shall submit the facts to the jury without directing how to find their verdict.' In view of these statutes four verdicts are possible in this case." In other parts of the charge these different verdicts, murder in the first or second degree, manslaughter and not guilty, are sufficiently explained. There were no facts before the jury which would support a verdict of manslaughter; under such

circumstances the court properly met its duty by removing this issue, so far as it could, from the consideration of the jury without violating the statute we have quoted above. In a like situation in *State* v. *Cianflone,* 98 Conn. 454, 463, 120 Atl. 347, we ruled: "The court was clearly right in its statement that there were no facts present which would reduce the crime to manslaughter, and it was not only not error not to have amplified its charge as to manslaughter, but its duty to remove, as it did, this issue from the consideration of the jury." See also *State* v. *McGuire,* 84 Conn. 470, 485, 80 Atl. 761; *State* v. *Saxon,* 87 Conn. 5, 22, 86 Atl. 590. A homicide committed under circumstances excluding the elements of justification, excuse, or extenuation, is one done with malice, and hence is murder, since murder is the unlawful killing of a human being with malice aforethought. Our statute provides: "All murder perpetrated by means of poison, . . . or by any other kind of wilful, deliberate and premeditated killing, . . . shall be murder in the first degree." General Statutes, § 6187. That is the charge in the indictment of the accused. The State offered abundant evidence, if the jury found the facts as claimed by the State, to find the accused guilty of murder in the first degree. The trial court will not ordinarily express its opinion that the case before the jury is one of first degree or not guilty, since not infrequently the line between the first and second degree is not marked with sufficient clearness to warrant the court in expressing its positive opinion. In the case before us the trial court expressed such an opinion and, at the same time, pointedly directed the attention of the jury to the statutory authority which gave them the power to find the accused guilty of homicide in a less degree than that charged and to disregard its opinion. We cannot hold this to have been error. The

facts in evidence, unless the jury credited the alibi defense of the accused, legally established the guilt of the accused as charged. A direction of a verdict by the court in a criminal case is prohibited by our statute. Public Acts of 1921, Chap. 267. The expression of an opinion by the court as to the relation of the facts, as they might be found by the jury, to the crime charged is, if reasonably and fairly exercised, within the discretion of the court, so long as it does not direct the verdict. Frequently the expression of an opinion by the trial court is an imperative duty in aiding the jury to understand and determine the issues involved, sensibly, intelligently and fairly. Whenever the trial court meets its duty well, "the charge must to some extent uncover the weakness of a weak case, the difficulties of a difficult case, or the strength of a strong case." *State* v. *Marx,* 78 Conn. 18, 28, 60 Atl. 690.

There is no error.

In this opinion the other judges concurred.