STATE OF CONNECTICUT *v.* LAWRENCE E. TOWNSEND

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued October 10, 1974—decision released February 4, 1975

*Michael P. Koskoff,* special public defender, with whom, on the brief, was *Lucy Katz,* for the appellant (defendant).

*Jerrold H. Barnett,* assistant state's attorney, with whom, on the brief, were *Joseph T. Gormley, Jr.,* chief state's attorney, *Donald A. Browne,* state's attorney, and *Richard F. Jacobson,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant was charged with two counts of assault with intent to murder in violation of General Statutes § 53-12, tried to a jury of twelve, and found guilty of two counts of aggravated assault in violation of General Statutes § 53-16. He has appealed from the judgment rendered on the verdict assigning various errors which he claimed occurred prior to and during the trial.

The state offered evidence to prove the following: On January 5, 1971, Bridgeport police officers Joseph Convertito and Paul Lengyel were on duty and assigned to gather information on what they deemed to be subversive or militant groups. They were in civilian clothes and drove an unmarked police vehicle. While on Broad Street they observed the defendant behind the wheel of a black Cadillac which was parked at the curb and which appeared to be stuck in the snow. Convertito knew that the defendant had used this car and that his license was under suspension. The engine of the Cadillac was running and the car was rocking and shaking. Two men were near the Cadillac. When the police vehicle stopped opposite the Cadillac, one of the men tried to stop Convertito from exiting, but he managed to get out. Lengyel exited from the other door and both officers approached the Cadillac. In the meantime, the defendant placed the gear selector into

park, slid across the seat and exited from the right front door of the Cadillac. It was the intention of the officers to question and arrest the defendant for operating a motor vehicle while his license was under suspension. While the defendant was on the sidewalk both officers displayed their badges and both called to the defendant stating in effect that they wanted to talk to him. The defendant backed away and the officers walked toward him. When they were about fifteen feet away, the defendant stopped and asked the officers in an obscene manner why they did not leave him alone. He then pulled out what appeared to be a .45 caliber semiautomatic weapon and fired two shots at the officers. Both officers ran for cover. Convertito fell and landed half in the street and half on the sidewalk. As he ran past Convertito, the defendant shot at him from a distance of about five or six feet. Lengyel by that time was behind the Cadillac, and, as the defendant went by, he fired a shot at Lengyel from a distance of two or three feet. This bullet shattered the rear window of the Cadillac. At this point neither officer had taken his revolver out of his holster. While the defendant was in the middle of the street, about twenty to thirty yards behind the Cadillac, he fired a shot, then turned and ran into a housing complex. Convertito fired six shots at the defendant, and Lengyel also fired from his revolver. The defendant escaped and was not arrested until later when he surrendered to the police. He was taken to a hospital for treatment for three leg wounds. More facts with greater detail were offered by the state, but the recited facts provide a sufficient background for discussion of the claims on appeal.

The defendant challenged the jury array selection process, claiming both statutory and constitutional

infirmities. At the hearing prior to trial, the defendant presented evidence through testimony of members of jury committees representing fourteen of the twenty-three towns comprising Fairfield County. The court found, in part, as follows:[1] Each town jury commissioner was sent instructions in accordance with § 51-217 of the General Statutes. Jurors were selected from the towns' lists of qualified electors. Seven towns selected names at predetermined intervals from the elector lists, for example, every fifth, tenth or fifteenth name. Three towns chose names at predetermined intervals within each letter of the alphabet to get a proportionate number of names from each letter. One town divided the list alphabetically and selected a given number of names at random from each letter. Two towns chose so as to list a proportionate number of names from each street. One town placed each elector's name on a piece of paper, divided the papers by election wards and then drew names at random in proportion to the population of each ward. All committees excluded those on a list of permanently disqualified persons received from the court clerk and all persons whose names had been submitted the previous year. Three towns tried to obtain a balanced number of men and women on their lists. Three towns did not choose both husband and wife from the same family. Some towns elected to exclude persons exempted from jury duty by statute; § 51-219; without determining if such persons desired to serve. No one was excluded from any town list of potential jurors because of race, religion, sex, employment, political affiliation or membership in any class or group.

[1] The court's finding directed to the challenge to the array is detailed and lengthy. No attempt is made in this opinion to incorporate all the facts found.

Each town committee submits its list of potential jurors to the county jury commissioners, who then send out questionnaires to all persons listed. On the basis of returned questionnaires all persons who, in the judgment of the commissioners, did not speak English, all nurses, lawyers, firemen, members of the federal and state militia, cases of extreme hardship, and those who had served on a jury the previous year, were eliminated. The names of the remaining potential jurors were turned over to the clerk of the Superior Court who keeps the names in boxes according to town. He determines how many names are to be drawn from each box, considering such factors as seasonal weather conditions and geographic area, so that fewer jurors are drawn from towns some distance from the courthouse in the winter and fewer from the Bridgeport area in the fall and spring. In 1971, the city of Bridgeport failed to supply 200 of its allotment of 1012 potential jurors. One finding indicates that on the June, 1971 panel seventeen names out of approximately 300 were from Bridgeport. An inconsistent finding indicates that the June, 1971 panel consisted of 330 jurors of which approximately fifty were from Bridgeport.

The defendant's claim of statutory violations in the selection process applies to the doings of jury committees in only fourteen of the twenty-three towns in the county; no evidence was offered to show deficiency in the selection process in nine towns. "A challenge to the array of jurors is an objection to the whole panel of jurors at once, and in order to be available it must be for a cause that affects all the jurors alike." *State* v. *Hogan,* 67 Conn. 581, 583, 35 A. 508. See also *State* v. *Cobbs,* 164 Conn. 402, 413, 324 A.2d 234; *State* v. *Luria,* 100 Conn. 207,

209, 123 A. 378; 47 Am. Jur. 2d, Jury, § 224; 5 Wharton, Criminal Law and Procedure § 1961. Since the challenge did not attack the validity of the entire panel it was inadequate on its face. *State* v. *Cobbs*, supra, 414; *State* v. *Hogan*, supra. Consequently, claims relating to statutory irregularities in the selection of jurors are not considered.[2] *State* v. *Cobbs*, supra.

Despite the ineffectiveness of the challenge to the array based on statutory violations, the record was examined to determine whether the defendant was prejudiced by the manner of selection. It is noteworthy that the findings that no one was excluded from any town list of potential jurors because of race, religion, sex, employment, political affiliation or membership in any class or group are not challenged. It does not appear that the rights of the defendant were prejudiced by the manner in which the panel was selected from the fourteen towns examined. *State* v. *Chapman*, 103 Conn. 453, 471-72, 130 A. 899. See *State* v. *Ferraro*, 146 Conn. 59, 147 A.2d 478, cert. denied, 369 U.S. 880, 82 S. Ct. 1155, 8 L. Ed. 2d 283; 50 C.J.S., Juries, § 175.

In his challenge to the array, the defendant also asserted that the Connecticut statutes are unconstitutional because they mandate a systematic discrimination against black persons and thereby deny the defendant a jury representative of the community of which he is a part. It is part of the established tradition in this country that an impartial jury be drawn from a cross section of the community. *Smith* v. *Texas*, 311 U.S. 128, 130, 61 S. Ct. 164, 85 L. Ed. 84. "This does not mean, of course, that every jury must contain representatives of all

---

[2] It is therefore unnecessary to consider the defendant's attack on the findings relating to these claims.

the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181.

The law does not require one system of selection over another nor does it require a system that would reach the best source of jurors. The federal constitution demands only that the system used by the state to select jurors produce an array which reflects a cross section of the county and from which a cognizable group or class of citizens has not been systematically excluded. *State v. Villafane*, 164 Conn. 637, 644, 325 A.2d 251; see *Hernandez v. Texas*, 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866. The selection process, of course, must be guided by pertinent statutory provisions. *Thiel v. Southern Pacific Co.*, supra.

The defendant claims that General Statutes §§ 51-217, 51-221 and 51-223, amended by Public Acts 1974, No. 74-183 § 53, discriminate against black people[3] by mandating that jurors be selected from voter registration lists and by requiring a reply to mailed jury questionnaires; that § 51-220 discriminates against citizens on the basis of residence; and that the actual selection procedures of the clerk of the court discriminated against residents of Bridgeport where the defendant resides.

---

[3] The defendant does not rely upon the "rule of exclusion" as laid down in *Norris v. Alabama*, 294 U.S. 587, 55 S. Ct. 579, 79 L. Ed. 1074, nor upon the statistical probability method discussed in *Alexander v. Louisiana*, 405 U.S. 625, 92 S. Ct. 1221, 31 L. Ed. 2d 536, to support this claim. See *State v. Villafane*, supra.

General Statutes § 51-217 requires that jurors be electors; § 51-221 requires that prospective jurors be chosen from voter registration lists. There is nothing in these statutes that discriminates on the basis of race or color. The statutory scheme is not unfair in itself; it is "capable of being carried out with no racial discrimination whatsoever." *Smith* v. *Texas,* ibid.

The claim that use of voter registration lists is discriminatory is somewhat surprising in that one of the cases relied upon by the defendant in another context, *Carter* v. *Jury Commission,* 396 U.S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549, reaffirms a prior decision rendered in *Franklin* v. *South Carolina,* 218 U.S. 161, 30 S. Ct. 640, 54 L. Ed. 980, upholding a jury selection statute in which one of the qualifications was that of being an elector. Further, in *Brown* v. *Allen,* 344 U.S. 443, 473, 73 S. Ct. 397, 97 L. Ed. 469, a list made up of a combination of taxpayers and voters was approved as nondiscriminatory.

The defendant argues, however, that because black residents tend to feel alienated from the political process they register and vote in smaller proportions than white residents. There is no evidence in this record to substantiate such a claim.

A related argument, that nonregistrants are a discriminatorily excluded cognizable group, was rejected in *Wilkins* v. *State,* 270 Md. 62, 310 A.2d 39. See also *United States* v. *Guzman,* 337 F. Sup. 140, 143 (S.D. N.Y.), aff'd, 468 F.2d 1245 (2d Cir.), cert. denied, 410 U.S. 937, 93 S. Ct. 1397, 35 L. Ed. 2d 602; *United States* v. *Greenberg,* 200 F. Sup. 382, 391 (S.D. N.Y.).

In addition, the defendant claims that § 51-223, which requires the mailing of questionnaires to potential jurors and their return, discriminates against black or poor individuals. The claim that black persons are less apt to return the jury questionnaire or more apt to move to an unknown address is conjecture and speculation. There is no evidence that the failure to follow up on unknown persons had a discriminatory effect as found in *Turner* v. *Fouche,* 396 U.S. 346, 90 S. Ct. 532, 24 L. Ed. 2d 567, cited by the defendant.

It is also asserted that then General Statutes § 51-220 established a quota system of jurors to be drawn from each town according to population, where the greater the town the smaller the percentage of electors is needed to fill the quota, and that this system overtly discriminates against residents of large cities and creates a lopsided jury array.

A table based on the provisions of then § 51-220[4] would be:

[4] "[General Statutes] Sec. 51-220. NUMBER OF JURORS FOR EACH TOWN. The number of jurors to be chosen for each town shall be as follows: In towns whose population as determined by the last-completed census of the United States is one thousand five hundred or less, thirty; in towns whose population so determined is more than one thousand five hundred but not more than twenty-five hundred, fifty-six; in towns whose population so determined is more than twenty-five hundred but not more than five thousand, ninety; in towns whose population so determined is more than five thousand but not more than ten thousand, one hundred twenty; in towns whose population so determined is more than ten thousand but not more than twenty-five thousand, two hundred twenty-five; in towns whose population so determined is more than twenty-five thousand but not more than fifty thousand, three hundred thirty-seven; in towns whose population so determined is more than fifty thousand but not more than one hundred thousand, six hundred seventy-five; and in towns whose population so determined is more than one hundred thousand, one thousand and twelve; provided, for the purposes of this section, the population of a town shall not include the patients of any state institution located in such town."

| Size of Town | | Jurors | Percentage of Population |
|---|---|---|---|
| 0 - | 1,500 | 30 | 2.0% |
| 1,500 - | 2,500 | 56 | 2.24 - 3.73% |
| 2,500 - | 5,000 | 90 | 1.80 - 3.60% |
| 5,000 - | 10,000 | 120 | 1.20 - 2.40% |
| 10,000 - | 25,000 | 225 | .90 - 2.25% |
| 25,000 - | 50,000 | 337 | .67 - 1.38% |
| 50,000 - | 100,000 | 675 | .675 - 1.37% |
| over | 100,000 | 1012 | 1.012% |

The widest statutory variant is between .67 percent and 3.73 percent. The actual numbers appear to minimize the claim: a town of 50,000 people would supply 337 jurors or .67 percent of its population and a town of 1500 people would supply fifty-six jurors or 3.73 percent of its population. Further, when these figures are assessed in light of the finding that three urban towns, Norwalk, Stamford and Bridgeport, represent one-half the county population, and in light of the need to balance rural and urban areas to obtain a fair cross section of the county, it is obvious that § 51-220 is not devised nor does it operate to discriminate systematically against citizens on the basis of residence. The defendant argues that the statutory quota system, coupled with the findings that the towns of Bridgeport, Stamford and Norwalk comprise one-half the population of the county and that six out of seven black people reside in these towns, operates to exclude a disproportionate number of black persons from selection. Juror selection is not based on residence, but on voter registration. Because it is not known what percentage of the black residents in these towns are registered voters and whether they are more concentrated in one town than another, it is impossible to decide this claim on the data pre-

sented. Moreover, there is no indication in this record that the statutory selection process of which the defendant complains in any way operated to deny him a jury array representative of his community or, more particularly, resulted in an under-representation of blacks.

In all of these statutory attacks, the defendant appears to be demanding that the array mirror the community with a proportionate number of his race. The constitution does not require proportional representation, and the impossibility of doing so has been recognized. See *Swain* v. *Alabama,* 380 U.S. 202, 208–209, 85 S. Ct. 824, 13 L. Ed. 2d 759; see also *Cassell* v. *Texas,* 339 U.S. 282, 286-87, 70 S. Ct. 629, 94 L. Ed. 839; *Akins* v. *Texas,* 325 U.S. 398, 403, 65 S. Ct. 1276, 89 L. Ed. 1692; *Virginia* v. *Rives,* 100 U.S. 313, 322-23, 25 L. Ed. 667. The constitution requires only a fair jury selected without regard to race. *Hernandez* v. *Texas,* supra, 477; *Cassell* v. *Texas,* supra.

In a somewhat related claim the defendant asserts that the selection procedures of the clerk of the court plus an under-representation of potential jurors from Bridgeport in the jury panel of 1971 discriminated against residents of Bridgeport and specifically against black persons. The court found that the assistant clerk of the court keeps each name on the jury list on a separate piece of paper in boxes according to towns; that he draws names for each panel of jurors from the town boxes according to population to obtain a panel of approximately 300 persons every four weeks; and that he determines how many names are to be drawn from each box, and in doing so, he considers such factors as weather conditions and geographic area, so that, for example,

during the winter fewer jurors are drawn from towns distant from the courthouse, and during the spring and summer fewer, jurors are drawn from the Bridgeport box and more from the outlying towns. To what extent and whether such practice was followed in this instance is unknown.

In addition, the court found that the town of Bridgeport failed to supply 200 of its allotment of 1012 potential jurors; that the county jury commissioners made several requests to the Bridgeport jury committee to send additional jurors in order to meet its allotment, but the committee failed to comply; that as a result, Bridgeport was not adequately represented on the jury array during 1971. There are inconsistent findings relating to the representation of jurors from the town of Bridgeport in the June, 1971 panel.

The defendant claims that he is entitled to be tried by jury members of the community in which the alleged crime was committed, the common law "jury of the vicinage." *People* v. *Jones,* 9 Cal. 3d 546, 510 P.2d 705. See *Peters* v. *Kiff,* 407 U.S. 493, 92 S. Ct. 2163, 33 L. Ed. 2d 83. From time immemorial in this state, the community unit which is the basis for the source of a jury array is that of a county, in this instance, Fairfield County. The issue to be determined then is whether the array was a fair cross section of that community.

Mere inequality in numbers selected from each unit of the county to make up a particular array, that of June, 1971, does not indicate a systematic discrimination. In one of its findings which is not attacked the court indicates that fifty of the 330 persons on the array were residents of Bridgeport.

Further, the finding that the assistant clerk varied the amounts from each town depending on the season also included the fact that his selection was proportionate to population.

The particular effect of these factors upon the representation of black persons in the array has not been shown. As previously stated, the number of black residents in Bridgeport and the percentage of those black residents who are voters is unknown; as is the number of black persons on the jury panel in June, 1971.

What is clear is that the constitution does not require that the jury be a statistical mirror of the community. *Swain* v. *Alabama,* supra; *Hoyt* v. *Florida,* 368 U.S. 57, 82 S. Ct. 159, 7 L. Ed. 2d 118; *State* v. *Villafane,* 164 Conn. 637, 646, 325 A.2d 251. Any variance that might have occurred in June, 1971, was not such as to evidence a purposeful or systematic discrimination against residents of Bridgeport and black residents in particular. *State* v. *Chapman,* 103 Conn. 453, 471–72, 130 A. 899; *State* v. *Rosa,* 87 Conn. 585, 89 A. 163. See also *State* v. *Davies,* 146 Conn. 137, 143, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537.

The defendant claims that he was arbitrarily deprived of his right to a hearing in probable cause in violation of the equal protection clause of the constitution of the United States. What was stated in *State* v. *Cobbs,* 164 Conn. 402, 405–6, 324 A.2d 234, need not be repeated here. The defendant claims, however, that even though the equal protection clause was satisfied in *Cobbs* because the grand jury hearing amply assured the defendant that the

charges brought against him were based upon probable cause, thereby giving him equal protection to that granted those who have probable cause hearings in Circuit Court, in this instance protection was not granted because he was arrested by a bench warrant which, he claims, is issued at the whim of a state's attorney.

The fourteenth amendment was not intended to deprive states of their power to establish and regulate judicial proceedings. The provisions only restrain acts which so transcend the limits of classification as to cause them to conflict with the fundamental conception of just and equal legislation. *Missouri Pacific Ry. Co.* v. *Larabee,* 234 U.S. 459, 34 S. Ct. 979, 58 L. Ed. 1398; 16 Am. Jur. 2d, Constitutional Law, § 533. In *State* v. *Hayes,* 127 Conn. 543, 581, 18 A.2d 895, it was held that the independent investigation made by the state's attorney and the determination by him that there was ample ground to proceed takes the place of a preliminary hearing by a magistrate and sufficiently fulfills all the requirements of due process of law, and that the filing of the original information without a probable cause hearing did not violate the fourteenth amendment to the constitution of the United States. Whether this procedure alone would stand the test of constitutionality in view of the present climate need not be determined. See *Shadwick* v. *Tampa,* 407 U.S. 345, 92 S. Ct. 2119, 32 L. Ed. 2d 783; *Coolidge* v. *New Hampshire,* 403 U.S. 443, 449–53, 91 S. Ct. 2022, 29 L. Ed. 564. But see *Beck* v. *Washington,* 369 U.S. 541, 545, 82 S. Ct. 955, 8 L. Ed. 2d 98; *Ocampo* v. *United States,* 234 U.S. 91, 34 S. Ct. 712, 58 L. Ed. 1231. Since 1965 and the case of *State* v. *Licari,* 153 Conn. 127, 214 A.2d 900, no bench warrant is issued unless the request for it includes

facts, supported by oath or affirmation, from which the court or judge issuing the warrant can make an independent determination of probable cause.

The independent determination of probable cause by a judge or a court from sworn affidavits accompanying a request for a bench warrant satisfies the equal protection clause of the fourteenth amendment to the constitution of the United States where an arrest by a bench warrant eliminates the hearing in probable cause in the Circuit Court.

The defendant asserts that the decision to utilize the bench warrant procedure under General Statutes § 54-43, thereby depriving him of a probable cause hearing in Circuit Court under General Statutes § 54-1a, is exercised at the whim of the prosecutor, and that the statute authorizing this procedure is inherently arbitrary in that it is lacking in standards.

The exercise of discretion, prosecutorial or judicial, is recognized and accepted within the administrative process of the criminal system. The decision to prosecute, to charge as a second offender, and to sentence, for example, may lay an unequal hand upon persons charged with the same crime. See *State* v. *Kanistanaux,* 68 Wash. 2d 652, 414 P.2d 784 (a prosecutor's option to charge a defendant in a court of limited jurisdiction, where a preliminary hearing is available, or in Superior Court, where an information is all that is required, does not constitute a denial of equal protection); see also *Ocampo* v. *United States,* supra. Where an equal protection claim is advanced, as here, an intentional and purposeful discrimination must be shown by one claiming discrimination. *Snowden* v. *Hughes,* 321 U.S. 1, 64 S. Ct. 397, 88 L. Ed. 497; see also

*Yick Wo* v. *Hopkins,* 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220. The defendant has failed to sustain this burden.

Nor is this discretionary power under the bench warrant statute vulnerable to a charge of denial of due process. The due process clause secures equality in providing a required minimum of protection for everyone's life, liberty and property. *Truax* v. *Corrigan,* 257 U.S. 312, 332, 42 S. Ct. 124, 66 L. Ed. 254. Since neither the probable cause hearing nor discovery opportunities incident thereto are constitutionally mandated, the bench warrant procedure, as indicated above, adequately affords such protection. See *Dillard* v. *Bomar,* 342 F.2d 789, 790 (6th Cir.) and cases cited therein.

The defendant claims he was denied due process when he was not notified and allowed to be present at the time of the ex parte hearing when the bench warrant was issued and bail was set. He, in effect, states that due process demands that no bench warrant may be issued without a hearing in which he is present with counsel.

It has been an established procedure in this state that nearly all felony prosecutions, if not bindovers, are initiated in the Superior Court in an ex parte procedure in which the state's attorney submits an application for issuance of a bench warrant. If the judge or court finds probable cause for the arrest, he or it causes the warrant to issue and sets a reasonable bond. *State* v. *Purvis,* 157 Conn. 198, 205, 251 A.2d 178; *State* v. *Keena,* 64 Conn. 212, 215, 29 A. 470. See also General Statutes § 54-43.

In the line of constitutional cases in the Supreme Court stemming from *Powell* v. *Alabama,* 287 U.S.

45, 53 S. Ct. 55, 77 L. Ed. 158, down through *Coleman* v. *Alabama,* 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 387, it has been firmly established that the sixth amendment constitutional right to counsel[5] attaches only at or after the time that adversary judicial proceedings have been initiated against him, that is, as soon as criminal charges are formally made against him and he becomes the subject of a "criminal prosecution." *Kirby* v. *Illinois,* 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411. The rationale stated in *State* v. *Stallings,* 154 Conn. 272, 283, 224 A.2d 718, in discussing the presence of counsel in a grand jury proceeding, is applicable in this case. It is not constitutionally impermissible for a court or judge to issue a bench warrant without the presence of either, or both of, the accused or his counsel. See *United States* v. *Ash,* 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619. *Coleman* v. *Alabama,* supra, does not compel a different conclusion.

What is applicable to bench warrants is also true of setting bail bonds on such warrants. It is a discretionary matter with the Superior Court unaffected by previous action in the Circuit Court. Immediately after arrest an accused has the right to relief against excessive bail. Conn. Const., art. I § 8. He may be heard fully on all the facts and circumstances relevant to the amount of his bail. If an accused is dissatisfied with the decision on such application, he may move for a review in this court. Practice Book § 694, as amended. This procedure fully accords with any reasonable concept of due process of law.

---

[5] This sixth amendment right which is claimed by the defendant in the present case should not be confused with the right against self-incrimination as illustrated by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

The defendant attacks the sufficiency of the affidavits supporting the bench warrant on the basis that the statements were uncorroborated hearsay and did not sufficiently allege probable cause. The defendant charges that the basis of the affiant's statement is the result of his investigation based on hearsay, which hearsay is not credited. The tests to be applied to determine whether an affidavit is properly drafted have been stated previously and need not be repeated here. *State* v. *Jackson,* 162 Conn. 440, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121. Hearsay statements may be the basis of a warrant. *Jones* v. *United States,* 362 U.S. 257, 271, 80 S. Ct. 725, 4 L. Ed. 2d 697; *State* v. *DeNegris,* 153 Conn. 5, 9, 212 A.2d 894; annot., 10 A.L.R.3d 359, 370. The affiant in this case was a police sergeant. In the affidavit it is stated: "I have conducted this investigation concerning the assault with intent to murder two police officers, Ptlmn. Paul Lengyel and Ptlmn. Joseph Convertito, and I have personally interviewed all witnesses in this case." Thereafter the events that occurred are recited with minute specificity. The only persons mentioned in the affidavit are the two victims of the assault; Superintendent Joseph A. Walsh and Lieutenant Anthony P. Fabrizi, who apprehended the defendant; and the defendant. The defendant does not, nor could he, attack the specificity or the sufficiency of the details of the crime alleged to support probable cause as was found wanting in such cases as *Whiteley* v. *Warden,* 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306; *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637; *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723. Rather, his claim is that the affidavit "is devoid of

any information as to the identity of the affiant's source, the reliability of that source, or the information recited."

The affidavit states the affiant spoke to "all" witnesses. The natural meaning of this phrase would be that he personally talked with the people who are thereafter referred to in the affidavit. It cannot be questioned that he did talk to the two victims, who were not injured and who ran from the defendant and were shot at by him and who did return his fire, if the affiant talked to "all" witnesses. Nor can it be questioned that if the affiant talked to "all" the witnesses he also talked to Superintendent Walsh and Lieutenant Fabrizi who apprehended the defendant and took him to the hospital for treatment of three bullet wounds. This information corroborated, in part, the statements of the victims.

It seems that the defendant questions the corroboration of the hearsay statements. The only persons mentioned in the affidavit other than the defendant are police officers. Upon reading the affidavit as a whole, it becomes clear that the detailed observations recounted in the affidavit cannot fairly be regarded as having been made in any significant part by persons other than the police officers. See *United States* v. *Ventresca,* 380 U.S. 102, 111, 85 S. Ct. 741, 13 L. Ed. 2d 684. It would be a meaningless requirement to verify the reliability and reputation for veracity of members of a police department by one of its own members. This was implicit in *United States* v. *Ventresca,* supra, 110–11, where the affiant made his affidavit based in part on observations by federal investigators and no requirement was set forth that their

credibility would need to be stated. The test on the issue of probable cause in warrants is well stated in *Spinelli* v. *United States,* supra, 419: "[W]e do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause . . . ; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial . . . ; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense . . . ; and that their determination of probable cause should be paid great deference by reviewing courts . . . ." There is no invalidity in the issuance of the bench warrant based on the affidavit, when the affidavit is read in its entirety.

There are three claims of error relating to the court's refusal to admit evidence showing bias and prejudice toward the defendant on the part of the complaining witnesses. One witness was called to testify that Convertito once stated that he did not like black people. A second witness was called to testify as to the general reputation for violence of Convertito and Lengyel and as to acts of violence by other police officers. The third witness was called to testify that Lengyel at the time of a riot about four months after the present incident waved a gun at her and called her an obscene name. A ruling on evidence must be tested by the finding. Practice Book §§ 635, 648; *State* v. *Croom,* 166 Conn. 226, 227, 348 A.2d 556; *Casalo* v. *Claro,* 147 Conn. 625, 627, 165 A.2d 153.

These claims did not arise out of a limitation placed on the cross-examination of witnesses but

upon the offers of proof of direct evidence. Nowhere in the finding is it shown that the two victims had been cross-examined on this subject or that any other foundation was laid for such evidence. The bias and prejudice of a witness may be shown either by cross-examination or by testimony of other witnesses. *State* v. *Mahmood,* 158 Conn. 536, 539, 265 A.2d 83. See *Fordiani's Petition,* 99 Conn. 551, 560-61, 121 A. 796; *Beardsley* v. *Wildman,* 41 Conn. 515, 517. Although many jurisdictions require a foundation to be first laid before bias or prejudice of a witness can be shown by statements made out of court, it has been consistently held in this state that it rests within the judicial discretion of the trial court whether to admit the impeaching statements where no foundation has been laid. *State* v. *Mahmood,* supra, 540; *Fairbanks* v. *State,* 143 Conn. 653, 657, 124 A.2d 893; *Adams* v. *Herald Publishing Co.,* 82 Conn. 448, 452, 74 A. 755; annot., 87 A.L.R.2d 407, 417. It cannot be said that the court abused its discretion in excluding the statements offered in view of the court's having allowed testimony, represented by twelve paragraphs of claims of proof, reciting incidents of alleged police brutality and harassment by police and by Convertito and Lengyel.

The defendant presented a witness who was acquainted with Convertito and Lengyel and who was a member of the community in which they worked to offer evidence as to the officers' reputation for violence and as to the reputation of the police in general for violence. The court allowed this witness to testify that the reputation of the two officers for truthfulness was very bad, but refused to allow the evidence as to their reputation for violence. The defendant claims that under the

rule in *State* v. *Padula,* 106 Conn. 454, 138 A. 456, such evidence was admissible. Had the defendant claimed either self-defense or other reason for shooting at the officers, his state of mind could very well be affected by his knowledge of the violent character of the victims, but in this case the defendant denies ever shooting at the officers. How violent the officers might have been was irrelevant to the defendant's claim that he never shot at either of them. The claim now raised in the brief that such evidence would be relevant to the defendant's running away does not appear in the record. As no such reason was presented to the court, it was not in error in refusing to allow the offered evidence. *Casalo* v. *Claro,* supra, 630.

The further offer by the defendant of testimony of a witness as to a violent act of one of the officers as evidence of a character trait was correctly refused. *Richmond* v. *Norwich,* 96 Conn. 582, 597, 115 A. 11.

During the trial the state introduced a bullet shell that had been found in the rear of the vehicle in which the defendant had been seated when first observed by the officers. There had been testimony that the defendant had shot at Lengyel while the latter was crouched behind the car and that the shot had shattered the rear window of the car. After the defendant's arrest the car was towed and later searched by an officer without a warrant.[6] A bullet shell was found on the floor in the rear of the vehicle. The defendant objected, claiming that

---

[6] The finding in the present case does not disclose that the car had been seized prior to the search, but in view of the admission that it had been, which is found in the briefs of both the defendant and the state, we take cognizance of that fact. See *State* v. *Mahmood,* 158 Conn. 536, 539–40, 265 A.2d 83.

as he had a possessory interest in the vehicle he had a right to challenge the legality of the search. Whether the defendant had standing need not be determined; the legality of the search is dispositive of this issue.[7]

It is clear that the search was not incident to an arrest but was made at some time after the defendant's arrest and not in his presence. See *Preston* v. *United States,* 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed. 2d 777. "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court,* 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930. Since the holding in *Carroll* v. *United States,* 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543, it has been recognized that the class of cases concerned with searches of motor vehicles has been treated, in some respects, as being an exception to the rule. In *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419, it was set forth that in exigent circumstances a warrantless search of an automobile supported by probable cause did not violate the fourth amendment constitutional provisions even after the car had been seized.

In the present case, the evidence that the defendant had been in the vehicle when first seen by the officers, that he was apparently trying to operate the vehicle, that he shot at them, and that one shot

---

[7] The defendant argues in his brief that the court overruled his objection on the basis of standing and not on the merits of whether the search was permissible and that, consequently, a review cannot be made of the legality of the search. The record reveals that the court inquired whether the defendant was the owner of the vehicle, but the record does not indicate that its ruling was on that ground. It only indicates that the court overruled the defendant's objection.

shattered the rear window of the vehicle, supported the judgment of the investigating police officer of probable cause for a search of the vehicle relating to the crime for which the defendant was arrested. Unlike the situation in *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564, where the vehicle was parked not in the highway but in the defendant's yard, where the police had known of the vehicle's role in the crime for some time, and where some of the exhibits were not removed until fourteen months after the seizure, the vehicle in the present case was not owned by the defendant, was parked in a highway, not on private property, and although disabled, was "movable" in that it was likely to be towed away. These circumstances satisfy the requirement of exigent circumstances as laid down in *Chambers* but not found to have existed in *Coolidge.*

The final assignment of error briefed is that the court was in error in admitting the defendant's prior felony conviction for impeachment purposes. It is well established that the credibility of a witness may be impeached by proof of prior convictions of crimes for which imprisonment may be more than one year. General Statutes § 52-145; *State* v. *Hall,* 165 Conn. 599, 606, 345 A.2d 17; *State* v. *Bitting,* 162 Conn. 1, 8–9, 291 A.2d 240; *State* v. *Marquez,* 160 Conn. 47, 273 A.2d 689. In both *State* v. *Bitting,* supra, and in *State* v. *Marquez,* supra, General Statutes § 52-145 and the authorities on this issue were discussed at length and no useful purpose will be served by repeating what was said in those cases. The court was not in error in this ruling.

There is no error.

In this opinion the other judges concurred.