STATE OF CONNECTICUT *v.* JOSEPH MACK, JR.
(12061)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued October 4—decision released November 26, 1985

*Michael R. Sheldon,* with whom, on the brief, were *Todd D. Fernow* and *Amy B. Lederer,* certified legal intern, for the appellant (defendant).

*Roland D. Fasano,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

SHEA, J. A jury found the defendant guilty of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and also of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2).[1] In this appeal from the judgment rendered in accordance with the verdict, the defendant claims that the trial court erred: (1) in denying his challenge to the array of jurors from which the jury that tried him was selected; (2) in charging the jury with respect to the credibility of the defendant and his interest in the outcome of the case; and (3) in displaying partiality in his comments upon the testimony.

---

[1] No issue has been raised concerning whether the defendant's separate convictions for robbery and larceny arising out of the same transaction may be multifarious. The trial court imposed concurrent sentences of fifteen years for the robbery and five years for the larceny, constituting an effective sentence of fifteen years.

The jury could reasonably have found from the evidence that the defendant, who was acquainted with the victims, Ella and Shedward Vereen, and who had learned that they had approximately $3000 in their possession, entered their home in New Haven on December 18, 1981, at about 9:30 p.m. wearing a toboggan hat with eye slits and carrying a gun. The victims, husband and wife, were asleep in bed and awoke to observe the defendant standing over them displaying a gun and mumbling something. They pleaded with him not to shoot and gave him the money, which was concealed in a pillow case. Despite the hat, which was pulled down to hide his features, the victims recognized him, even addressing him as "Joe" during the robbery. Two of their children, who also had previously known the defendant, were present in the home at the time of the robbery and recognized the defendant in the course of the commission of the crime. The victims notified the police, naming the defendant as the perpetrator of the crimes, and he was soon apprehended.

I

The defendant filed a challenge to the array and a motion to dismiss the jury panel, which was denied by the court, *Celotto, J.,* after a hearing on June 8, 1982. Thereafter, a jury trial began that ended in a mistrial on July 2, 1982. Before commencement of a second trial on November 9, 1982, the defendant filed another challenge to the array and a motion to dismiss the jury panel. The parties stipulated that the array of jurors from which a jury for the second trial would be chosen had been summoned and selected in the same manner as the array from which the jury for the first trial was chosen. Relying on the earlier ruling by Judge Celotto involving the same issues, the court, *Mulvey, J.,* denied the motion.

The motion filed by the defendant in the trial court raised three grounds for challenging the array of jurors: (1) that the statutes governing selection methods deprived the defendant of his constitutional right to a jury comprised of a fair cross-section of the community because they discriminate against black and Hispanic citizens, against women, against residents of large urban areas, and against other cognizable groups in the community; (2) that the array was selected in violation of the juror selection statutes; and (3) that the manner in which the clerk summoned members of the array to serve in the monthly jury pools was unauthorized by law and violative of the defendant's constitutional rights to due process of law, equal protection, and trial by an impartial jury. Only the second claim involving statutory violations has been pursued in this appeal, the constitutional claims having been abandoned by failure to brief them. *State* v. *Seravalli,* 189 Conn. 201, 207, 455 A.2d 852, cert. dismissed, 461 U.S. 920, 103 S. Ct. 2076, 77 L. Ed. 2d 291 (1983); *State* v. *Altrui,* 188 Conn. 161, 178, 448 A.2d 837 (1982).

The defendant claims two statutory violations in the selection of the array of jurors available at the time of his trial: (1) that the chief state jury administrator, Thomas Hickey, without authorization by statute or court order,[2] increased by 1563 the number of jurors to be summoned for the array to serve the New Haven judicial district for the year beginning October 1, 1981, approximately one-third above the chief clerk's estimate of the number needed (4569), which had been submitted pursuant to General Statutes § 51-219b (c),[3] as

---

[2] General Statutes § 51-229 allows the court at any time to draw "a sufficient number of additional jurors to prevent the necessity of summoning talesmen."

[3] "[General Statutes] Sec. 51-219b. HOW TO DETERMINE NUMBER OF JURORS TO BE SUMMONED. (a) In determining the number of jurors to be summoned for jury duty at a court location, the following factors, as well as any other factors which may be relevant, shall be considered: The num-

well as above the total (4828) provided for in General Statutes § 51-220,[4] which specified a particular number of jurors for each town based upon its population class; and (2) that, in allocating this one-third increase, the administrator neglected to follow the provision of General Statutes (Rev. to 1981) § 51-219c (2)[5] that,

ber of judges assigned to jury trials at the court location; the types of cases that will come to trial during the period of time for which the panel will be summoned; the experience of the court location in regard to the number of jurors who actually serve in relation to the number of jurors who are summoned for service; and the experience of the court location in regard to the number of jurors required in the juror pool in order to insure that judicial affairs will be reasonably conducted without delay.

"(b) Clerks of court shall keep and furnish any records and data which the jury administrator requires in order to determine whether jurors are being effectively utilized.

"(c) For the purpose of analyzing whether the number of prospective jurors required by section 51-220 is suitable, during the month of October of each year each chief clerk of the superior court shall notify the jury administrator in writing of (1) the estimated number of prospective jurors who will be needed to serve at such particular court location or locations during the year commencing the first of the next succeeding September, and (2) the towns from which the prospective jurors shall be drawn."

[4] "[General Statutes] Sec. 51-220. NUMBER OF JURORS FOR EACH TOWN. The number of jurors to be chosen for each town shall be as follows: In towns whose population as determined by the last-completed census of the United States is less than seven hundred and fifty, fifteen; in towns whose population so determined is at least seven hundred and fifty but not more than one thousand five hundred, thirty; in towns whose population so determined is more than one thousand five hundred but not more than twenty-five hundred, fifty-six; in towns whose population so determined is more than twenty-five hundred but not more than five thousand, ninety; in towns whose population so determined is more than five thousand but not more than ten thousand, one hundred twenty; in towns whose population so determined is more than ten thousand but not more than twenty-five thousand, two hundred twenty-five; in towns whose population so determined is more than twenty-five thousand but not more than fifty thousand, three hundred thirty-seven; in towns whose population so determined is more than fifty thousand but not more than one hundred thousand, six hundred seventy-five, and in towns whose population so determined is more than one hundred thousand, one thousand and twelve; provided, for the purposes of this section, the population of a town shall not include the patients of any state institution located in such town."

[5] "[General Statutes (Rev. to 1981)] Sec. 51-219c. INCREASE IN NUMBER OF JURORS. If it is determined that the estimate by the chief clerks under subsection (c) of section 51-219b, is in excess of the number of jurors chosen under section 51-220 for those towns within a given judicial district,

"where possible, the total increase shall be distributed to all towns within the judicial district and in proportion to each town's population based on the last United States census." The state concedes the facts relied upon by the defendant in raising these claims.

We do not address the merits or the consequences of the statutory deviations alleged because we have concluded that they do not affect all the jurors comprising the array alike, as is essential for a proper challenge to the array. *State* v. *Hart,* 169 Conn. 428, 434, 363 A.2d 80 (1975); *State* v. *Townsend,* 167 Conn. 539, 544–45, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); *State* v. *Cobbs,* 164 Conn. 402, 413–14, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973); *State* v. *Silver,* 139 Conn. 234, 242, 93 A.2d 154 (1952); *State* v. *Smith,* 138 Conn. 196, 202, 82 A.2d 816 (1951); *State* v. *Luria,* 100 Conn. 207, 209–10, 123 A. 378 (1923). "A challenge to the array of jurors is an objection to the whole panel of jurors at once, and in order to be available it must be for a cause that affects all the jurors alike." *State* v. *Hogan,* 67 Conn. 581, 583, 35 A. 508 (1896). A challenge that does not implicate the validity of the entire panel is inadequate. *State* v. *Townsend,* supra, 545. It appears that of the 6132 persons called for jury service by the administrator, 4569, the num-

the jury administrator may increase the number of jurors chosen for those towns within the judicial district in the following manner: (1) The total increase in number shall be determined by the jury administrator and may be of sufficient amount to equal the chief clerk's estimate under subsection (c) of section 51-219b; (2) where possible, the total increase shall be distributed to all towns within the judicial district and in proportion to each town's population based on the last United States census; (3) on or before January first, the jury administrator shall notify the respective town jury committees, in writing, of the increase in the number of jurors to be chosen for service commencing the following September; (4) the number of jurors chosen for any town shall revert to the number stated under section 51-220 when actual usage statistics, compiled by the jury administrator, indicate an increase is unwarranted."

ber given by the chief clerk pursuant to General Statutes § 51-219b (c), were properly summoned, because the alleged irregularities in the increase of approximately one-third made by the administrator cannot be deemed to invalidate the authorization to call the number of jurors prescribed by the clerk. Until the authorized number was exceeded no question could arise concerning the validity of the increase of 1563 decided upon by the administrator. We fail to perceive how the irregularities regarding those jurors summoned as a result of the increase can be said to infect the eligibility for jury service of those falling within the original authorization.[6] It appears, therefore, that since the defendant's challenge related only to the 1563 jurors brought into the array because of the increase made by the administrator, it was not "for a cause that affects all the jurors alike." State v. Hogan, supra. Unlike State v. McGee, 80 Conn. 614, 619–20, 69 A. 1059 (1908), a decision relied upon by the defendant where a challenge to the array was upheld because all the prospective jurors had been drawn by a deputy sheriff rather than by the clerk of court as required by statute, the statutory deviations claimed by the defendant affect only those additional jurors and not the entire array.

As we have noted, the defendant has abandoned his constitutional claims relating to the composition of the jury array and he claims no prejudice resulting from the alleged statutory violations. It is difficult to con-

---

[6] Whether the 1563 jurors who may have been unlawfully summoned could have been identified and thus subjected to a challenge for cause in the voir dire for the selection of the petit jury is not clear from the record before us. See State v. Luria, 100 Conn. 207, 210, 123 A. 378 (1923). Although all the jurors were summoned at one time, it is not clear whether the surplus jurors could have been segregated by the sequence in which their names appeared on the list as a whole or as representing a particular town. As the movant, the defendant bore the burden of providing an adequate record for his challenge. State v. McCarthy, 197 Conn. 247, 249–50 n.4, 496 A.2d 513 (1985); State v. Jones, 193 Conn. 70, 74 n.2, 475 A.2d 1087 (1984).

ceive the manner in which the availability of additional jurors in the array from which the panel was drawn for the trial of his case could have prejudiced him. See *State* v. *Townsend,* supra; *State* v. *Cobbs,* supra, 414–15. Accordingly, we find no error in the denial of the challenge to the array by the trial court.[7]

## II

The defendant, who testified at his trial, claims error in the charge upon the credibility of witnesses in which specific reference was made to the interest of the defendant in the outcome as a factor to be considered in evaluating his testimony. As the defendant recognizes, this court has yet to disapprove such an instruction, though some other courts have done so. "We have repeatedly considered and rejected this constitutional claim and again find it to be totally without merit." *State* v. *Frazier,* 194 Conn. 233, 239, 478 A.2d 1013 (1984); *State* v. *Roos,* 188 Conn. 644, 645, 452 A.2d 1163 (1982); *State* v. *Avcollie,* 188 Conn. 626, 636–38, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

The defendant claims that the instruction given in this case differed materially from other instructions upon the subject of a defendant's interest in a criminal trial that we have previously reviewed.[8] Although

---

[7] In view of the result we have reached that the defendant's grounds for challenging the array do not affect the entire panel, we need not consider whether the statutory nonconformities raised constitute "a material departure from the requirements of law governing the selection and summoning of an array." See Practice Book § 842.

[8] This portion of the charge was as follows: "Then, of course, you heard the testimony of the accused, Mr. Mack. In weighing the testimony he has given you, *you should apply the same principles by which the testimony of other witnesses are tested,* and that necessarily involves the consideration of what I mentioned a few minutes ago, that of his interest or lack of interest in the case. You must consider the importance to him of the outcome of the trial, and any motive that he might have on that account for not telling

the defendant did except to unrelated parts of the charge, no exception was taken to the portion concerning the defendant's interest, as is ordinarily necessary to preserve such a claim of error for appeal. Practice Book § 315. We have treated the basic claim that specific mention of the defendant's interest infringes upon his right to a fair trial as falling within the claimed deprivation of a "fundamental constitutional right" bypass of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). *State* v. *Avcollie,* supra, 637; *State* v. *Maselli,* 182 Conn. 66, 74, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981). We must, therefore, examine the nuances of language, belatedly relied upon by the defendant, only for the purpose of determining whether they are significant enough to have affected the fairness of his trial. *State* v. *Torrence,* 196 Conn. 430, 435, 493 A.2d 865 (1985); *State* v. *Kurvin,* 186 Conn. 555, 564–65, 442 A.2d 1327 (1982).

The defendant points first to the instruction that the jury "must consider the importance to him of the outcome of the trial, and any motive that he might have on that account for not telling the truth." We have on prior occasions found no error in essentially similar instructions: "In weighing the testimony [the defendant] has given you, you should apply the same principles by which the testimony of other witnesses [is] tested, and that necessarily involves a consideration of his interest in the case. You will consider the importance to him of the outcome of this trial." *State* v. *Avcollie,* 636–37 n.6; see *State* v. *Mastropetre,* 175 Conn. 512, 525–26, 400 A.2d 276 (1978); *State* v. *Guthridge,* 164 Conn. 145, 151 n.1, 318 A.2d 87 (1972).

---

the truth. An accused person stands before you *just like any other witness, and is entitled to the same consideration and must have his testimony measured in the same way as any other witness,* including, however, specifically, his interest in the verdict that you are to render." (Emphasis added.)

The defendant is also critical of the concluding sentence of this part of the charge: "An accused person stands before you just like any other witness, and is entitled to the same consideration and must have his testimony measured in the same way as any other witness, including, however, specifically, his interest in the verdict you are to render." The defendant's objection is to repetition of the reference to his interest in the case. Again, we have sanctioned similar instructions previously. *State* v. *Avcollie,* supra, 636 n.6 (" 'including, of course, his interest in the verdict you are to render' "); *State* v. *Mastropetre,* supra, 526 (" 'including, particularly, his interest in the verdict, which you may render' "). We do not find the variations in language relied on by the defendant to be of such significance as to warrant a conclusion that the defendant was deprived of a fair trial. We must, however, stress the importance of evenhandedness in referring to the defendant's interest as compared with that of other witnesses. We have recognized that technically correct instructions on this subject may violate this principle if repeated unnecessarily or overemphasized in some other manner. See *State* v. *Kurvin,* supra, 570 n.3.

## III

In his final claim of error the defendant claims the trial judge displayed an appearance of partiality toward the state in some of his comments during the testimony and also during the charge to the jury. As no objection or exception was raised to most of these remarks during trial, let alone a motion for mistrial, we are limited in our review of them to deciding whether they infringed upon the defendant's constitutional right to a fair trial. *State* v. *Evans,* supra, 70. We conclude that, although some of the comments were improper, none of them rises to the level of constitutional error.

## A

At a point near the end of the defendant's lengthy cross-examination of Ella Vereen, a victim, who had testified about the amount of money taken in the robbery and whose answers indicated an unfamiliarity with record keeping, the court interjected: "She isn't a C.P.A., I have got news for you." Counsel then replied: "I know that your Honor." Inappropriate as this remark of the court was, it cannot reasonably be viewed to indicate partiality nor does it appear that trial counsel so regarded it.

## B

In instructing the jury on the value element of larceny and the necessity of finding that the money taken by the defendant exceeded $2000 for a first degree larceny conviction, the trial court referred to the testimony of Ella Vereen in mentioning that the jury could examine the financial records she had kept and again opined that "it's obvious that the operation was not under the guidance of a C.P.A., that's for sure." The court also mentioned that this witness had testified that she had "better than $3000, but first degree larceny is better than $2000." In addition, the court referred to the position of the defendant, that the records did not support Vereen's testimony, and then left the determination of the amount taken to be found by the jury as a question of fact. The defendant's only exception to this part of the charge was that the witness had not testified that more than $3000 was in her possession, but exactly $3000. We can discern no basis whatever for the claim of the defendant that these instructions evidenced a "predisposition toward the state's case" on the part of the trial court.

C

The instance of alleged partiality principally relied on by the defendant arose during the cross-examination of a police officer who had participated in the arrest of the defendant. The officer had testified that when he first approached the defendant, who was pointed out to him by Elwood Vereen, a son of the victims, the defendant was wearing two hats, a dark blue or black knit-type pullover hat with eye slits that he wore underneath a similarly styled bright white and green hat. These hats were referred to at various times in the trial as toboggan hats or "toboggan pulldowns." The officer at that time was under the impression that the robber had used a mask and did not realize that the victims claimed that he had worn a toboggan hat with eye slits. The officer returned the hats to the defendant after first removing them to be sure that no weapon was concealed under them. The next day, learning that a toboggan hat with eye slits had been worn by the robber, the officer then inquired of the detectives in charge of the investigation whether the hats he had observed had been seized. He discovered later that the hats had not been seized by the detectives. At this point in the cross-examination of the officer, the colloquy set forth in the footnote[9] occurred.

---

[9] "Q. In such a situation, if an officer, a patrol officer, is advised that there is no detective available to handle the robbery investigation, doesn't it then become the job of the patrol officer to take into custody the evidence?
"A. No.
"Q. No? You just let the evidence go with the perpetrator?
"A. No.
"Q. No? Isn't that what you did in this case?
"A. No.
"Q. You didn't?
"A. I was told that the detective that would come out at 12:00 o'clock midnight would take the case; that is what I was told.
"The Court: There is something that I would like to clear up; on the 18th, when you first reported and learned of the robbery and then picked up this

Although a judge must be extremely circumspect, especially in jury trials, in questioning witnesses so that he will not appear to be taking a position of advocacy, comments or questions for the purpose of clarifying the testimony are permissible and often necessary. *State v. Echols,* 170 Conn. 11, 14, 364 A.2d 225 (1975); *LaChase* v. *Sanders,* 142 Conn. 122, 125, 43 A.2d 752 (1955); *Ladd* v. *Burdge,* 132 Conn. 296, 298, 43 A.2d 752 (1945); *State* v. *Ortiz,* 38 Conn. Sup. 549, 551, 454 A.2d 277 (1982). The questions asked of the officer by the court concerning the time when he discovered the kind of hat the victims said the robber had worn are within this principle, as they can reasonably be viewed as intended to clear up a possible misunderstanding by the jury. The court did not assume the role of advocate or otherwise abuse its discretion. See *Hutchinson* v. *Plante,* 175 Conn. 1, 3, 392 A.2d 488 (1978); *Goggins* v. *Fawcett,* 145 Conn. 709, 713, 147 A.2d 187 (1958); *McWilliams* v. *American Fidelity Co.,* 140 Conn. 572, 580, 102 A.2d 345 (1954); *State* v. *Cianflone,* 98 Conn. 454, 468, 120 A. 347 (1923).

---

man, did you start to say—my recollection is that you did, and then you died away—that you were looking for a mask?

"A. Yes.

"The Court: You weren't looking for a ski cap?

"A. Right.

"The Court: On the 18th?

"A. Right.

"The Court: You found out that it was a ski cap that was used the next day, on the 19th?

"A. Right.

"The Court: You see, you are leaving the impression that this officer is a pretty dumb officer, and that isn't fair. He was looking for something else on the 18th.

"Mr. Brunswick: Well, I don't think that is a fair comment, your Honor.

"The Court: You indicated that he didn't collect evidence, he didn't have any evidence, he never did find a mask.

"Mr. Brunswick: I am not claiming that, your Honor.

"The Court: Well, that is the impression I got. I have got a job to protect an officer who is trying to do the best he can when he is out of his element."

Though we find no impropriety in the court's inquiries of the witness, the comments to counsel that followed were highly inappropriate. The remarks not only tended to denigrate defense counsel for "leaving the impression that this officer is a pretty dumb officer," but also might have been construed to indicate a favorable view of the credibility of the witness on the part of the court and to suggest some alliance between the court and the police: "I have got a job to protect an officer who is trying to do the best he can when he is out of his element."

Although the comments were erroneous, we are not convinced that they were sufficiently prejudicial to affect seriously the fairness of the trial so as to warrant a new trial. Counsel for the defendant, though he did say that the initial comment concerning his attempting to leave an impression that the witness was "a pretty dumb officer" was unfair, made no objection to the later comment about protecting an officer on the witness stand. At no time did he move for a mistrial. We are reluctant to award a new trial where those most concerned, better placed than we to assess the courtroom atmosphere, did not view the remarks to be so prejudicial as to warrant a new trial and preferred to stake the outcome on the trial under way. "We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 609, 616, 236 A.2d 466 (1967).

We are also convinced that the evidence of guilt in this case is so overwhelming that any possible prejudice the defendant may have suffered from the court's remarks had no significant bearing on the verdict. The defendant was recognized during the course of the rob-

bery not only by the two victims but also by two of their children, Elwood and Diane Vereen. These children, as well as their parents, had known the defendant for a long time before the incident and were present when he visited their home earlier in the evening. The two children observed the defendant remove the hat he had worn over his face during the robbery immediately afterward as he was leaving the premises and they were able to observe his features. The son, Elwood, pointed out the defendant on the street to the arresting officer and observed that he was then wearing a green toboggan hat over the black one he had worn during the robbery. Both victims and their daughter, Diane, also observed the defendant wearing a green toboggan hat over a dark one when they saw the defendant in the custody of the police after he had been arrested. Thus it appears that the only significant part of the officer's testimony, that the defendant was wearing the hats described at the time of his arrest, was amply supported by the testimony of other witnesses despite the inability of the state to produce the hats at trial. To the extent that the court's remarks may have tended to enhance the credibility of the officer, the testimony involved related to the same facts that four other witnesses had also sworn to having observed. We conclude, therefore, that the court's remarks could not have materially affected the verdict despite our strong disapproval of them.

There is no error.

In this opinion the other judges concurred.